1  David L. Scher, Esq.
2  dscher@employmentlawgroup.com
   California Bar No. 184562
3  R. Scott Oswald, Esq. (to be admitted *pro hac vice*)
4  soswald@employmentlawgroup.com
   The Employment Law Group, P.C.
5  888 17th Street, NW, Suite 900
6  Washington, D.C. 20006
   (202) 261-2806
7  (202) 261-2835 (facsimile)
8

FILED
CLERK, U.S. DISTRICT COURT
DEC 1 2 2013
CENTRAL DISTRICT OF CALIFORNIA
BY          DEPUTY

9
   RECEIVED
   CLERK, U.S. DISTRICT COURT
10 DEC - 5 2013
11
   CENTRAL DISTRICT OF CALIFORNIA
12 BY          DEPUTY

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

13
14  UNITED STATES OF AMERICA *ex rel.*
    [UNDER SEAL],
15
16          Plaintiff,
17  v.                                          Case No. CV13-09173 FMO (SSx)
18                                              **FILED UNDER SEAL**
19  [UNDER SEAL],
                                                Pursuant to 31 U.S.C. § 3729
20          Defendant.                          (False Claims Act)
21
22
23

24  David L. Scher, Esq.
25  dscher@employmentlawgroup.com
    California Bar No. 184562
26  R. Scott Oswald, Esq. (to be admitted *pro hac vice*)
27  soswald@employmentlawgroup.com
    The Employment Law Group, P.C.
28  888 17th Street, NW, Suite 900

_The Employment Law Group, P.C._
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

FALSE CLAIM ACT *QUI TAM* COMPLAINT UNDER SEAL

CASE NO. _____

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

Washington, D.C. 20006
(202) 261-2806
(202) 261-2835 (facsimile)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* )<br>KEVIN CODY )<br>MUGE CODY )<br>42318 Iron Bit Place )<br>Chantilly, Virginia 20152, )<br>)<br>    Plaintiff, )<br>)<br>v. )<br>)<br>MANTECH INTERNATIONAL )<br>CORPORATION, )<br>)<br>   12015 Lee Jackson Highway )<br>   Fairfax, Virginia 22033 )<br>)<br>**Serve: Registered Agent:** )<br>)<br>   C T Corporation System )<br>   818 West Seventh Street )<br>   2nd Floor )<br>   Los Angeles, California 90017 )<br>)<br>) | Case No. _____<br>**FILED UNDER SEAL**<br><br>Pursuant to 31 U.S.C. § 3729<br>(False Claims Act) |

FALSE CLAIM ACT *QUI TAM* COMPLAINT UNDER SEAL

CASE NO. _____

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

## Introduction

1.     Qui tam relators Kevin and Muge Cody, by and through their attorneys, individually and on behalf of the United States of America, file this complaint against ManTech International Corporation to recover damages, penalties, and attorneys' fees for violations of the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.*

2.     ManTech is a leading government contractor that specializes in providing technological services to the United States government.

3.     Since being founded in 1968, ManTech has grown to become one of the U.S. military's leading providers for operational support in southwest Asia, most notably in Iraq during Operation Iraqi Freedom, and in Afghanistan during Operation Enduring Freedom.

4.     ManTech's largest contract involves the Mine Resistant Ambush Protected family of vehicles (MRAP).

5.     On September 11, 2012, following a GAO Protest Decision in which ManTech was the non-moving party, ManTech was awarded Contract W56HZV-12-C-0127 (MRAP CLSS contract or the contract), valued at $618 million for the first 14 months of the contract.

6.     The total contract value is $2.85 billion over five years, if all options are exercised.

---

**FALSE CLAIM ACT *QUI TAM* COMPLAINT UNDER SEAL**

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

7.   Under the MRAP CLSS contract, ManTech was required to provide vehicle support maintenance for over 15,000 MRAP vehicles in Afghanistan and Kuwait.

8.   In order to accomplish this task, ManTech was required to (1) provide deployment and operations support for more than 1,000 employees throughout Afghanistan and Kuwait; (2) provide field level maintenance for the MRAP vehicles; (3) provide sustainment level maintenance for the MRAP vehicles; (4) provide battle damage assessment and repair services; and (5) provide repair part supplies and management of those supplies in Afghanistan and Kuwait.

9.   ManTech has two operating business groups, one of which is the Technical Services Group (TSG).

10.   The Global Contingency Operations division (GCO) is a subdivision within the TSG Systems Sustainment and Integrated Logistics (SSILOG) Business Unit (BU).

11.   During the proposal phase of the contract, Relator Kevin Cody served at ManTech as the Business Unit (BU) President and General Manager (GM) for the TSG SSILOG Business Unit.

12.   The SSILOG BU is one of four business units within TSG.

13.   Kevin Cody's wife, co-Relator Muge Cody, worked within the GCO as the Vice President for Ground Systems Operations.

---

FALSE CLAIM ACT *QUI TAM* COMPLAINT UNDER SEAL

CASE NO. _____

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

14.     In executing their work-related responsibilities, both Kevin and Muge Cody discovered defective pricing in the contract which led to substantial violations by ManTech of the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*

15.     Because Kevin and Muge Cody's discovered and protested ManTech's fraudulent conduct in violation of 31 U.S.C. §§ 3729 *et seq.*, ManTech subjected both Kevin and Muge Cody to a series of retaliatory acts in violation of 31 U.S.C. §§ 3730(h).

16.     ManTech's GCO Division, within the TSG, falsely manipulated the Fringe Rates for the MRAP CLSS proposal submitted by ManTech in September 2011, and subsequently revised pursuant to numerous Evaluation Notice Discussions (ENDs) with the U.S. government, in order to win the resultant contract.

17.     ManTech knowingly and falsely depressed their Fringe Rate from an expected 60% to 47% as a part of ManTech's Price to Win (PTW) strategy for the MRAP CLSS contract.

18.     ManTech developed this strategy to lower its labor rates for professional services and reduce its fringe costs by over $12 million in order to win the new contract, by not including all of the Hazardous and Isolation (Haz/Iso) pay as planned Fringe expenses.

19.     After the award of the MRAP CLSS contract, ManTech knowingly and falsely reported the intentionally depressed Fringe Rate overages, pursuant to the

---

**FALSE CLAIM ACT *QUI TAM* COMPLAINT UNDER SEAL**

CASE NO. _____

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

1  actual costs incurred on the contracts, as unplanned increases in the Fringe rates via

2  Variance Rate Revenue charges, which the U.S. Government paid.

3

4      20.    For just two months, December 2012 and February 2013, the total

5  Variance Revenue charges falsely billed to the government were $3,180,632.63.

6

7      21.    All of these costs and more should have been included by ManTech in

8  the original proposal and the resultant MRAP CLSS contract.

9      22.    During the period of January 2013 through September 2013, ManTech

10

11 knowingly made several false statements and submitted nine (9) fraudulent invoices

12 or false claims totally about $6 million, in order to inappropriately recover indirect

13

14 cost shortfalls, due to its earlier fraudulent underpricing on the MRAP CLSS

15 proposal to win the contract award.

16

17     23.    In connection with the filing of this original Complaint, the Relators

18 have furnished the United States with substantially all material evidence and

19 information in the Relators' possession.

20

21                    **Jurisdiction and Venue**

22     24.    This Court has subject matter jurisdiction over this action under 31

23

24 U.S.C. §§ 3730 and 3732.

25     25.    This Court has personal jurisdiction over ManTech pursuant to 31

26 U.S.C. § 3732 (a) because ManTech transacts business in this judicial district.

27

28

---

26.     Venue is proper in this District pursuant to 31 U.S.C. § 3732 (a) and under 28 U.S.C. § 1391(c) because ManTech transacts business in the Western Division of this judicial district.

## Parties

27.     Relators Kevin and Muge Cody are both residents of the Commonwealth of Virginia, residing at 42318 Iron Bit Place, Chantilly, VA 20152.

28.     Both Kevin and Muge Cody represent an "original source" of this information within the meaning of 31 U.S.C. § 3730(e)(4)(B), and state that to their knowledge, the information contained herein has not been publicly disclosed.

29.     Kevin Cody began working for ManTech in 1990.

30.     In June 2008, ManTech promoted Kevin Cody to Senior Vice President of the Operating Unit, and then to Business Unit General Manager within the Technical Services Group.

31.     Muge Cody is the Division Vice President for Ground Systems Operations Division, the division that includes the MRAP CLSS contract.

32.     As part of their professional responsibilities, both Kevin and Muge Cody are responsible for signing off on all finalized cost proposal details for the contract, and thus have intimate knowledge of the fraudulent underbid of the contract.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

33.     The Codys are currently employed by ManTech, and thus have direct knowledge of the false records, statements and claims ManTech has presented to the Government.

34.     ManTech is a $3 billion government contractor responsible for providing various technological services to the U.S. Government.

35.     ManTech is headquartered at 12015 Lee Jackson Highway, Fairfax, Virginia 22033.

36.     Founded in 1968, ManTech has a long history of performing highly technical cost-reimbursement contracts on behalf of the U.S. military.

37.     ManTech's largest contract involves the MRAP Family of Vehicles contract.

38.     In 2011 and 2012, the contract represented one-fifth of ManTech's revenue and one-eighth of the company's personnel.

39.     In 2013, the contract remains a large contributor to the indirect generation of TSG and ManTech International business capital for company operations.

## Factual Allegations

**ManTech violated the Federal Acquisition Regulations during the proposal period.**

40.     Pursuant to the Federal Acquisition Regulations (FAR) and the Defense Contract Audit Agency (DCAA) Audit Manual, all government contractors wishing

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

FALSE CLAIM ACT *QUI TAM* COMPLAINT UNDER SEAL

CASE NO._____

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

to obtain a cost-reimbursement contract must disclose all cost and pricing information in their proposals for review by U.S. Government source selection personnel.

41.     The disclosures are required to be consistent with the Forward Pricing Rate Agreement (FRPA), and must include the cost and pricing information for the FRPA.

42.     This specifically includes any build-up information for all direct labor costs, other direct costs, and indirect costs, including but not limited to General and Administrative (G&A) and Fringe Expenses (GCO Fringe or Fringe rates).

43.     A Fringe Rate is typically described as a percentage, and consists of the cost of an employee's benefits, divided by his/her wages.

44.     Fringe Benefits (i.e., the numerator) include the cost of paid vacation, holidays, and sick days.

45.     In addition, Fringe Benefits include the annual costs of the following benefits: health (medical, dental, and vision) insurance; life insurance; and disability insurance.

46.     Hazardous and Isolation pay (Haz/Iso), when provided for working in a hazardous location such as Afghanistan, is typically applied to the Direct Labor or Other Direct Cost (ODC), not the Fringe Benefits.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

47.     It is the policy of ManTech, pursuant to its Cost Accounting Standards (CAS) Disclosure Statements, to apply Haz/Iso pay to direct labor costs, not to Fringe Benefits.

48.     ManTech failed to abide by the requirements of FAR 30.201-3 *et seq.*, by improperly depressing its final bid price by approximately $12 million.

49.     In the September 2011 MRAP CLSS proposal, ManTech falsely depressed its bid by knowingly allocating funds for only the first 40 hours of Haz/Iso pay, not the full 84 hours of Haz/Iso pay to which each employee working in Afghanistan under the MRAP contract was then entitled under the CLSS bridge contract.

50.     ManTech falsely underfunded the incumbent employee compensation by adopting an average Direct Labor (DL) rate for the bridge contract and applying this forward to the competitive proposal.

51.     ManTech did this knowing the bid proposal contained a Haz/Iso calculation changed from all hours worked for the 84 hour-work week, to only 40 hours of funded compensation per week.

52.     This fraudulent cost depression permitted ManTech to lower its cost within the Global Contingency Operations Cost Segment.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

53.   ManTech had full knowledge that it planned to actually pay each of its employees working in Afghanistan Haz/Iso pay on all 84 hours worked within a one week period.

54.   Thus, ManTech falsely understated its planned Fringe Rate by 44 hours of Haz/Iso pay for each weekly period for each of the thousand-plus employees it planned to perform services in Afghanistan for the period of the MRAP CLSS contract.

55.   In disclosing cost and pricing information that deliberately understated the value of incumbent compensation, ManTech knowingly violated the provisions of FAR 30.201-3 *et seq.*

**ManTech's Price to Win Strategy (PTW) caused its executives to keep the deflated Fringe Rate during the proposal period.**

56.   As evidenced by its Price to Win (PTW) Workbook, ManTech executives believed ManTech would significantly increase its chance of winning the MRAP contract by lowering the final bid price by $12 million.

57.   ManTech's Price to Win strategy reduced ManTech's Fringe expense from $37 million to $25 million, while simultaneously allowing it to artificially lower its billing rate for its professional services.

58.   ManTech's PTW strategy drove ManTech's executive to develop a new cost segment titled Global Contingency Operations (GCO), per ManTech's PTW Workbook, CLSS-PTW Model, July 28, 2011, in order to offer lower rate structures

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

to reduce ManTech's cost and increase its probability of winning the MRAP CLSS

contract.

59.     Following the September 2011 submission of ManTech's proposal, the

U.S. Army Tank-Automotive and Armaments Command (TACOM) began asking

ManTech to clarify the cost and information data used to calculate the September

2011 proposal via a series of Evaluation Notice Discussions (ENDs).

60.     Concerned that the ENDs would result in ManTech being forced to raise

its labor rates to accommodate lost compensation generally derived from Haz/Iso

uplifts on the full 84 hours on the September 2011 proposal, ManTech reduced the

DL employee rates, driving down compensation on the pre-existing MRAP CLSS

bridge contract.

61.     In doing so, ManTech hoped to avoid a noticeable discrepancy in total

employee compensation requested by TACOM between the September 2011

proposal and the current CLSS bridge contract.

62.     ManTech was able to keep the false $12 million price "reduction" as

part of its PTW strategy, and continued to misrepresent the expected performance

costs under the September 2011 proposal.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

**In approximately March 2012, Kevin Cody discovered, and reported, the discrepancy in the Fringe Rate; but ManTech executives dismissed his report and did nothing to change the $12 million understatement; Muge Cody raised similar concerns and ManTech dismissed her concerns.**

63.     In February 2012, TACOM expressed concern that ManTech's September 2011 proposal would be insufficient to retain a loyal workforce to execute the MRAP contract.

64.     To ensure workforce loyalty, ManTech first elected to add additional labor premiums of $1,500 per person per month to its September 2011 bid.

65.     As part of the executive team responsible for ensuring workforce retention, Kevin Cody was asked to develop an internal pricing strategy to fully fund the added premium labor costs.

66.     ManTech Business Operations, under Bonnie Cook, included the premium labor costs into the GCO fringe cost segment instead of including it into the Direct Labor (DL) Category.

67.     Upon adding the premium labor costs into the GCO Fringe cost segment instead of the DL labor category, Kevin Cody discovered that ManTech had incorrectly calculated the GCO Fringe Rate.

68.     He did not immediately understand how this had occurred.

69.     After further review, Kevin Cody brought the issue to Jim Maguire, the Vice-President of Finance Operation and TSG Compliance; Bonnie Cook, the Senior

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

Vice-President; Chris Williamson, one of Jim Maguire's direct reports; and C.W. Etzler, the Vice-President of Corporate Pricing.

70.     These executives dismissed Kevin Cody's concerns, and ManTech did nothing to change the $12 million understatement in its September 2011 proposal.

71.     On March 26, 2012, Kevin Cody again raised the issue of the GCO Fringe miscalculation to several ManTech executives.

72.     Between March 6, 2012 and March 26, 2012, Kevin Cody calculated that the September 2011 bid proposal did not include the required funds to fully fund the Haz/Iso pay uplift for all 84 hours.

73.     Despite Kevin Cody's objections that ManTech had underfunded the GCO Fringe Rate, ManTech executives continued the underfunding to ensure that ManTech had a competitive PTW.

74.     During the same time period, Muge Cody expressed similar concerns to her managers about ManTech's underfunding of the GCO G&A rate, particular to the PMO staffing.

75.     In order to ensure a competitive PTW, ManTech spent the following month reducing the DL costs to be included in the final bid.

76.     Notwithstanding Kevin Cody's March 26, 2012 calculation that the GCO Fringe Rate had been underfunded, ManTech elected to send the final cost and technical volumes to the U.S. Army on April 24, 2012.

---

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

77.   When it submitted the final proposal, ManTech knew that the GCO Fringe Costs were underfunded, as only $25,939,636 of the roughly $37 million required to fully fund the 84 hours of Haz/Iso pay was requested.

78.   To make up the underfunding, ManTech eventually began accumulating, and then subsequently billing the Government for, so-called Variance Revenue Rate charges as ManTech executed a "true-up" of costs.

**ManTech knowingly and falsely reported GCO Fringe Rate deficits as Variance Rate Revenue charges.**

79.   ManTech falsely used lowered GCO Fringe Revenue Rates to help them win the MRAP CLSS contract.

80.   After contract award, ManTech reported the higher Fringe expenses as Variance Rate expenses.

81.   Variance Rate charges are common, as operating costs can legitimately fluctuate for many reasons, such as increases in health care cost, disability insurance costs, and other factors.

82.   In order to recoup the 44 hours of Haz/Iso pay that ManTech deliberately excluded from its final proposal in April 2012, ManTech began billing the U.S. Government for the Haz/Iso pay as "Variance Rate" charges, even though the charges were predicted and expected by ManTech and did not result from any kind of legitimate fluctuation in operating costs.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

83. From November 5, 2012, through December 31, 2012, ManTech's GCO division expended an unbudgeted amount of $934,785.11 for its Fringe Rate.

84. The $934,785.11 was unbudgeted in the GCO Fringe Rate because ManTech deliberately requested less than the full 84 hours of Haz/Iso pay that ManTech intended to pay, and did pay, to each incumbent employee working in Afghanistan under the MRAP contract, in accordance with ManTech's cost proposal.

85. To make-up for this deficit, ManTech charged the U.S. Government for the 44 unbudgeted hours per employee per pay period in the GCO Fringe costs as Variance Revenue in the amount of $934,785.11 during 2012 for the CPFF portion of the contract.

86. ManTech has continued billing the U.S. Government for Variance Revenue from January 1, 2013 to present for these predicted and expected GCO Fringe costs.

87. All of the GCO Fringe costs billed by ManTech as Variance Revenue on the MRAP CLSS contract have been falsely billed as unplanned allowable Variance Revenue.

88. All planned Fringe expenses should be fully disclosed to the U.S. Government in the Forward Pricing Rate proposal and in the contractor's proposal for all cost-reimbursement and time-and-material contracts.

---

FALSE CLAIM ACT *QUI TAM* COMPLAINT UNDER SEAL

CASE NO._____

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

89.     Failure to fully disclose current, accurate, and complete cost and price information in a cost-reimbursement and time-and-materials (T&M) contract is a basis for fraud and is defective pricing in U.S. Federal government contracts, pursuant to the Truth in Negotiations Act (TINA).

**In 2013, ManTech knowingly made several false statements and submitted nine fraudulent invoices or false claims totaling about $6 million, in order to inappropriately recover indirect cost shortfalls, due to its earlier fraudulent underpricing on the MRAP CLSS proposal.**

90.     From January 2013 through September 2013, ManTech knowingly made several false statements and submitted nine (9) fraudulent monthly invoices or false claims to the U.S. Army, totaling about $6 million, in order to inappropriately recover indirect cost shortfalls, due to its fraudulent underpricing on the MRAP CLSS proposal to win the contract award.

91.     In a letter to TACOM dated July 23, 2013, ManTech falsely stated to the U.S. Government, "It is not ManTech's intention to change our DCAA approved billing rates at this time."

92.     ManTech made another false statement in a letter to the U.S. Army dated August 9, 2013, when it stated, "The indirect rates used are the DCAA provisional approved rates with an applied indirect rate variance estimate."

93.     These statements are false because ManTech's internal emails show that during the June 2013 to July 2013 period, ManTech was preparing to submit a new rate proposal to DCAA for a new Forward Pricing Rate Agreement (FPRA).

94.     In fact, ManTech submitted the proposed new FPRA rates to DCAA in early August 2013.

95.     DCAA approved the new FPRA rates later in August 2013.

96.     On September 16, 2013, ManTech increased the GCO Fringe and G&A rates, retroactively from January 1, 2013, which increased invoiced costs to TACOM in the amounts of $3,993,574 (GCO Fringe) and $1,943,108 (G&A) through September 6, 2013.

97.     Retroactive indirect rate cost increases may be deemed allowable, if properly incurred and reported.

98.     But ManTech made these retroactive rate revisions and revised its Cost Accounting Standards (CAS) Disclosure Statement in an effort to inappropriately comingle the increased GCO and IS cost centers, allowing ManTech to shift more incurred costs from TSG-wide contracts based in the IS cost center to the U.S.M.C. Fixed Price Contract and the Cost Plus Fixed Fee (CPFF) TACOM CLSS MRAP contract.

99.     ManTech will utilize the new set of 2013 FRPA rates to invoice GCO costs through the remainder of 2013.

100.    On March 15, 2013, ManTech invoiced the Government $928,345 for variance accrued during 2012.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

101.   As of September 6, 2013, ManTech has defrauded the U.S. Government via GCO Fringe variance rates a total of $4,921,919, with a projected sum of $5,922,813.37 by December 31, 2013.

102.   ManTech has invoiced retrospective G&A rates from the August 2013 FPRA as a distinct and separate $1,943,108, bringing the total current and projected damages through December 31, 2013 to $7,865,921.37.

103.   Prior to submission of October 2013's invoice, ManTech collapsed the GCO cost center and has now invoiced the TACOM MRAP CLSS contract with 2013 IS rates - fringe, G&A, MH, and OH.

104.   This substantially increases the post-award false claims submitted by ManTech to $18,598,042, representing invoiced costs increases from January 1, 2013 through November 8, 2013.

105.   This unilateral action by ManTech violates FAR 30.401, Consistency in Estimating, Accumulating, and Reporting Costs, and FAR 30.402, Consistency in Allocating Costs Incurred for the Same Purpose, in effect on the date of award of the contract.

106.   The $18,598,042 in false claims by ManTech is in addition to the more than $12 million in costs that ManTech has begun to charge as "true up" fringe to offset its fraudulent underbidding.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

107.   ManTech knowingly, intentionally, and repeatedly made false statements and false claims to the U.S. Government in a coordinated effort to recover costs which were underpriced on the CLSS MRAP contract.

108.   ManTech attempted to mask these additional indirect cost variances as appropriate cost variances.

109.   ManTech has repeatedly falsely stated in letters and emails to the U.S. Army TACOM procurement office and DCAA that the indirect rate increases were caused by the Government's actions, specifically the U.S. Army's request after contract award in April 2013 for the de-obligation of funds tied to the Afghanistan drawdown of forces and related support services.

110.   ManTech deliberately did not fully or adequately address the U.S. Government's requests for cost information.

111.   As a part of ManTech's proposal for the CLSS MRAP contract, ManTech certified in its K-9 and K-10 Cost Accounting Standards (CAS) Certifications that it would adhere to all GCO cost accounting practices and contract award would not "result in a required or unilateral change in cost accounting practice."

112.   But in December 2012, ManTech submitted a revised GCO CAS Disclosure Statement in which it unilaterally changed the GCO cost accounting practice.

---

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

113.   ManTech appropriately submitted the CAS Disclosure Statement to DCAA and DCMA, but chose not to disclose the cost impact to the U.S. Army TACOM Contracting Officer.

114.   ManTech has for years, according to its CAS Disclosure Statements, grouped OCONUS and CONUS direct labor cost and fringe cost together.

115.   But for the CLSS MRAP proposal, ManTech created a new GCO cost center, which separated the direct labor cost from the fringe cost.

116.   This cost accounting change was disclosed via a revised CAS Disclosure Statement.

117.   For ManTech's PTW strategy, it needed the lowest labor rates feasible for its proposal and wanted to artificially drive down its fringe rate to 23.8%.

118.   In 2012, after the contract award, ManTech submitted a revised GCO CAS Disclosure Statement that merged the new GCO cost center with the IS cost center and created new increased FPRA rates, which increased the GCO fringe rate to 30%.

119.   This was not disclosed to the TACOM Contracting Officer as required by the Federal Acquisition Regulation, nor reviewed or approved by DCAA.

120.   This fringe rate increase is not properly or reasonably distributed in proportion to the benefits received, especially when the fringe rate for the GCO

FALSE CLAIM ACT *QUI TAM* COMPLAINT UNDER SEAL

CASE NO. _____

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

1   ManTech CLSS MRAP contract remained virtually unchanged at 30%, while all

2   other cost centers fringe rates were reduced by 5%.

3

4   121.   FAR 31.203(e) provided that ". . . Contractors must notify the

5   Contracting Officer (CO) and the cognizant DCAA auditor of planned changes prior

6   to implementation.  Contractors should consider pursuing an advance agreement with

7

8   the CO when changing allocation methods."

9   **ManTech retaliated against the Codys because they protested ManTech's**
10   **fraudulent underbidding and false claims.**

11
      **a.  After Kevin Cody protested ManTech's actions, ManTech management**
12      **circulated false rumors that he planned to resign.**

13

14   122.   Since November 2012, ManTech management has circulated false

15   rumors that Kevin Cody planned to resign from ManTech.

16   123.   These rumors began soon after Kevin Cody complained about

17
     ManTech's fraudulent underbidding on the contract and raised concerns about
18

19   associated violations of internal financial controls and accounting principles during

20
     the MRAP FOV CLSS proposal and bidding process.
21

22   124.   In 2012, as detailed above, Kevin Cody made several inquiries and

23   complaints about ManTech's proposal on the MRAP FOV CLSS contract.
24

25   125.   Kevin Cody's supervisors were familiar with each area of concern, as

26   Kevin Cody diligently made his concerns known both prior to proposal and after

27
     contract award.
28

---

126.   During the proposal process, Kevin Cody said he was concerned that ManTech had failed to adequately increase the premium fringe rate, with the result that millions of dollars that should have been included in the proposal were not included.

127.   Kevin Cody expressed his belief that ManTech was aware that the premium was 100% higher than the bid proposal.

128.   Kevin Cody expressed his belief that DL (Direct Labor) rates were too low in the proposal, because the DL rates were based on greening efforts prior to proposal and award.

129.   Kevin Cody expressed his concern that the costs proposed to cover indirect personnel were insufficient, because such costs only showed 14 personnel in the Personnel Management Office (PMO) when there were in fact 60.

130.   In February 2013, Kevin Cody also told ManTech management that his concerns about the fraudulent underbidding also made him concerned that ManTech's SEC-required internal financial controls had failed, and this failure of internal controls could harm ManTech's shareholders.

131.   ManTech leadership initiated false rumors that Kevin Cody planned to resign, and did so because he had expressed his concerns about the fraudulent underbidding and the associated failures of ManTech's internal financial controls and internal accounting procedures.

FALSE CLAIM ACT *QUI TAM* COMPLAINT UNDER SEAL

CASE NO. _____

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

**b. After Muge Cody protested ManTech's actions, ManTech management circulated false rumors that she planned to resign.**

132.   Since late 2012, ManTech management has circulated false rumors that Muge Cody planned to resign from ManTech.

133.   These rumors began soon after Muge Cody complained about ManTech's fraudulent underbidding on the contract and raised concerns about associated violations of internal financial controls and accounting principles during the MRAP FOV CLSS proposal and bidding process.

134.   Muge Cody frequently expressed her concerns to her supervisors about ManTech's ability to carry true labor costs and fringe costs on the contract.

135.   Muge Cody expressed her concern that ManTech's proposed costs to cover indirect personnel were insufficient, because such costs only showed 14 personnel in PMO when there were 60.

136.   In February 2013, Muge Cody also told ManTech management that her concerns about the fraudulent underbidding also made her concerned that ManTech's SEC-required internal financial controls had failed, and this failure of internal controls could harm ManTech's shareholders.

137.   ManTech leadership initiated rumors false rumors that Muge Cody planned to resign, and did so because she had expressed her concerns about the fraudulent underbidding and the associated failures of ManTech's internal financial controls and internal accounting procedures.

**c. ManTech moved Muge Cody's division away from Kevin Cody's area of responsibility following the Codys' protected activity, significantly diminishing Kevin Cody's responsibilities.**

138.   Following the Codys' complaints regarding ManTech's fraudulent underbidding and its failed internal financial controls, ManTech moved Muge Cody's division under the supervision of Senior Vice President and Program Executive Michael Brogan.

139.   As a result of this move, Kevin Cody no longer managed the MRAP FOV contract, and ManTech had significantly diminished his responsibilities.

140.   Kevin Cody asked Lou Addeo, the TSG Chief Operating Officer and President, to explain the reason for Kevin Cody's diminished responsibilities.

141.   Addeo said that it was inappropriate for Kevin Cody to manage his wife, Muge Cody.

142.   Kevin Cody responded that he and Muge Cody had been married for over six years, their relationship had never caused any performance issues, and Muge Cody had always worked under him as they grew the MRAP FOV business.

143.   ManTech reassigned Muge Cody and diminished Kevin Cody's responsibilities as retaliation for their previous expressions of concern about ManTech's fraudulent underbidding and its failed internal financial controls.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

**d. ManTech retaliated against Muge Cody by excluding her from important emails related to the MRAP CLSS program, thus diminishing her responsibilities; and ManTech further reduced her duties after she complained about the exclusion.**

144.   Following Muge Cody's reassignment away from Kevin Cody on December 19, 2012, Muge Cody fell under the supervision of Program Executive Michael Brogan.

145.   Nate Webster was hired as Muge Cody's deputy, effective January 28, 2013, although ManTech told Webster to report directly to Brogan.

146.   After Muge Cody's retaliatory reassignment to Brogan, Brogan repeatedly excluded Muge Cody from important emails regarding business operations, while including Muge Cody's deputy, Webster.

147.   Muge Cody complained to Human Resources about the retaliatory exclusion and met with HR representatives to attempt to resolve the issue.

148.   Despite Muge Cody's repeated complaint to her Human Resources representatives, ManTech continues to exclude her from meetings and business decisions, and has deliberately not provided her with financial documents she needs to effectively perform her job functions.

149.   Brogan's exclusion of Muge Cody from important emails regarding business operations is retaliation for her previous expressions of concern about ManTech's fraudulent underbidding and its failed internal financial controls.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

150.   Since complaining about her exclusion from important decisions regarding her proper business functions, Muge Cody's input has been summarily dismissed by Brogan, Bonnie Cook, and Sandra Cogan, another ManTech manager.

151.   Muge Cody responded to the false accusations by again complaining of retaliation to her Human Resources representative, reiterating that ManTech had intentionally underbid the contract, and that the issues for which she was being blamed stemmed from that fraudulent underbidding.

152.   The continued harassment of Muge Cody by ManTech's Business Operations Unit management is retaliation for her expressions of concern regarding ManTech's fraudulent underbidding and its failed internal financial controls, and for her complaints about prior retaliation.

153.   On June 26, 2013, Muge Cody met with Dan Keefe, the newly promoted TSG COO, regarding the retaliation.

154.   Keefe delivered a written statement in which he summarily dismissed all complaints filed by Muge Cody to HR; he did not permit any discussion of the complaints.

155.   Following the June 26, 2013 meeting, Muge Cody again stated in writing that ManTech had deliberately underbid the contract.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

156.   Following the June 26, 2013 meeting, Muge Cody again stated in writing that ManTech had retaliated against her for raising issues regarding ManTech's failed internal financial controls.

157.   Following the June 26, 2013 meeting, Muge Cody again said that since her forced reassignment, Brogan and Cook had diminished her duties.

158.   Prior to the June 26, 2013 meeting, Muge Cody again said that she had been bullied and harassed by managers in the Business Operation Unit because she had expressed her concerns about ManTech's underbidding.

159.   During the June 26, 2013 meeting, Keefe responded by falsely accusing Muge Cody of bullying and harassment.

### e.  ManTech dismissed Kevin Cody's reports of retaliation.

160.   On June 26, 2013, Kevin Cody met with Keefe, the newly promoted TSG COO, to discuss the retaliation Kevin Cody had suffered since disclosing ManTech's fraudulent underbidding.

161.   Keefe delivered a written statement in which he summarily dismissed all complaints filed by Kevn Cody to HR; he did not permit any discussion of the complaints.

162.   Following the June 26, 2013 meeting, Kevin Cody again stated that ManTech had deliberately underbid the contract.

---

163.   Following the June 26, 2013 meeting, Kevin Cody again stated that ManTech had retaliated against him for reporting ManTech's failed internal controls and its underbidding.

164.   During the June 26, 2013 meeting, Keefe claimed that neither Kevin Cody nor Muge Cody had complained about ManTech's internal controls.

165.   Kevin Cody reiterated that he had complained about internal controls, and he providing emails outlining his and Muge Cody's previous expressions of concern.

166.   Following the June 26, 2013 meeting, Kevin Cody again said that ManTech had retaliated against him by demoting him on December 19, 2012.

**f.  In October 2013, ManTech further diminished Kevin Cody's duties.**

167.   On October 9, 2013, Kevin Cody learned that ManTech planned to consolidate business units, moving and consolidating SSILOG into an organization under the direction of Rick Simis.

168.   Keefe further explained that the change was necessary because Kevin Cody's business unit was currently valued at only $10 million per year.

169.   Kevin Cody's business unit was substantially larger than $10 million per year, but it had been significantly reduced by ManTech's earlier retaliation on December 19, 2012 when ManTech stripped Kevin Cody's unit of the MRAP business.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

170.   By the October 9, 2013 reorganization, ManTech has further diminished Kevin Cody's duties, and reduced Kevin Cody's reputation in his field.

171.   ManTech further diminished Kevin Cody's responsibilities on October 9, 2013 in retaliation for his expressions of concern regarding ManTech's fraudulent underbidding and its failed internal financial controls, and for his complaints about prior retaliation.

## Count I:  False Claims Act Violations
### 31 U.S.C. § 3729(a)(1) Against
### Defendant

172.   Kevin Cody and Muge Cody re-allege and incorporate the allegations set forth above as though fully alleged herein.

173.   ManTech knowingly caused to be presented to the United States Government false or fraudulent claims for payment or approval under contract W56HZV-12-C-0127 (MRAP CLSS or "the contract").

174.   ManTech knowingly and fraudulently induced the United States Government to award ManTech the MRAP contract, by knowingly and recklessly providing inaccurate cost and pricing information during the proposal period, in violation of FAR 30.201-3 *et seq.*

175.   ManTech knowingly and fraudulently induced the United States Government to award ManTech the MRAP contract, by failing to apply Haz/Iso pay to direct labor costs, and instead placing this cost center in the fringe benefit

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

category, in violation of ManTech's Cost Accounting Standards Disclosure Statements.

176.   ManTech knowingly and fraudulently induced the United States Government to award ManTech the MRAP contract, by falsely underfunding the incumbent employee compensation, by adopting an average Direct Labor (DL) rate for the bridge contract and applying this forward to the competitive proposal; and ManTech did so knowing the bid proposal contained a changed Haz/Iso calculation from all hours worked for the 84 hours work week, to only 40 hours of funding per week.

177.   ManTech's GCO cost segment, within the TSG, knowingly and fraudulently manipulated the Fringe Rates for the MRAP CLSS proposal submitted by ManTech in September 2011, and subsequently revised pursuant to numerous Evaluation Notice Discussions (ENDs) with the U.S. government, in order to win the resultant contract.

178.   ManTech knowingly and falsely depressed their Fringe Rate from an expected 60% to 47% as a part of ManTech's Price to Win (PTW) strategy for the MRAP CLSS contract.

179.   ManTech developed this strategy to lower its labor rates for professional services and reduce its fringe costs by over $12 million in order to win the new

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

contract, by not including all of the Hazardous and Isolation (Haz/Iso) pay as planned Fringe expenses.

180.   After the award of the MRAP CLSS contract, ManTech knowingly and falsely reported the intentionally depressed Fringe Rate overages, pursuant to the actual costs incurred on the contracts, as unplanned increases in the Fringe rates via Variance Rate Revenue charges, which the U.S. Government paid.

181.   For just two months, December 2012 and February 2013, the total Variance Revenue charges falsely billed to the government were $3,180,632.63.

182.   All of these costs and more should have been included by ManTech in the original proposal and the resultant MRAP CLSS contract.

183.   During the period of January 2013 through September 2013, ManTech knowingly made several false statements and submitted nine (9) fraudulent invoices or false claims totally about $6 million, in order to inappropriately recover indirect cost shortfalls, due to its earlier fraudulent underpricing on the MRAP CLSS proposal to win the contract.

184.   In order to recoup the 44 hours of Haz/Iso pay that ManTech had failed to request funds for in April 2012, ManTech knowingly caused to be presented to the United States Government false or fraudulent claims for payment or approval, by billing the U.S. Government Variance Rate charges to compensate for the *predictable* budget shortfall.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

185.   ManTech knowingly caused to be presented to the United States Government false or fraudulent claims for payment or approval on March 15, 2013, by fraudulently charging $934,875.11 in Variance Rate charges for the period November 5, 2012, through December 31, 2012, to compensate for GCO fringe that was deliberately excluded from the initial bid of the contract.

186.   ManTech knowingly caused to be presented to the United States Government false or fraudulent claims for payment or approval on September 16, 2013, by fraudulently charging $4,921,919 in GCO Fringe Variance Rate charges for the period January 1, 2013, through September 6, 2014, to compensate for GCO fringe which was deliberately excluded from the initial bid of the contract.

187.   The projected sum of fraudulent claims for payment presented to the United States Government, to compensate for GCO fringe which was deliberately excluded from the initial bid of the contract, will be $5,922,813.37 by December 31, 2013.

188.   ManTech knowingly caused to be presented to the United States Government false or fraudulent claims for payment or approval on September 16, 2013, by fraudulently invoicing an additional $1,943,108 in retrospective G&A rates for the period January 1, 2013, through September 6, 2013, in order to compensate for G&A funds which was deliberately excluded from the initial bid of the contract.

FALSE CLAIM ACT *QUI TAM* COMPLAINT UNDER SEAL

CASE NO. _____

189.    ManTech knowingly caused to be presented to the United States Government false or fraudulent claims for payment by invoicing retroactive G&A rates as a distinct and separate $1,943,108, thus bringing the total current and projected damages through December 31, 2013 to $7,865,921.37, in order to compensate for GCO Fringe and G&A funds which ManTech deliberately excluded from the initial bid of the contract.

### Count II:  False Claims Act Violations
### 31 U.S.C. § 3730(h) Against
### Defendant

190.    Kevin Cody and Muge Cody re-allege and incorporate the allegations set forth above as though fully alleged herein.

191.    ManTech cannot retaliate against an employee who engages in protected conduct under the False Claims Act, 31 U.S.C. § 3730(h), by taking lawful actions in furtherance of an FCA action, including investigation for, testimony for, or assistance in an action filed under the FCA.

192.    An employee has engaged in protected conduct when litigation under the False Claims Act is a distinct possibility, when the conduct reasonably could lead to a viable FCA action, or when litigation is a reasonable possibility.

193.    An employee need not actually file a *qui tam* suit or even know about the protections of section 3730(h) to qualify for protection under the retaliation provision.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

194.   An employee who characterizes the employer's conduct as illegal or fraudulent, or recommends that legal counsel become involved, engages in protected conduct.

195.   As set forth above, and in connection with the foregoing scheme, ManTech conspired to get fraudulently-induced claims paid or approved by the U.S. Government, in violation of the False Claims Act.

196.   Kevin Cody and Muge Cody are both "employees," and ManTech is an "employer," as those terms are defined by the False Claims Act.

197.   ManTech unlawfully discriminated against Kevin Cody and Muge Cody, as a result of the Codys performing lawful acts to stop one or more violations of the False Claims Act, including reporting to ManTech's leadership the scheme by ManTech to fraudulently induce, through underbidding, the U.S. Government to award Mantech the MRAP CLSS contract; and to then disguise its underbidding by submitting false claims for so-called "variances."

198.   Kevin Cody and Muge Cody, in good faith, believed that the underbidding they discovered and reported could have led to violations of the False Claims Act.

199.   Kevin Cody and Muge Cody took lawful actions in furtherance of an FCA action by investigating the underbidding  and warning ManTech of the consequences of the underbidding.

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

200.    A reasonable employee in the same or similar circumstances as Kevin Cody and Muge Cody might believe that ManTech was committing fraud against the U.S. Government.

201.    ManTech unlawfully retaliated against Kevin Cody for his lawful acts to stop one or more violations of the False Claims Act by significantly diminishing his duties and responsibilities, and harming his professional reputation.

202.    ManTech unlawfully retaliated against Muge Cody for her lawful acts to stop one or more violations of the False Claims Act by significantly diminishing her duties and responsibilities, and harming her professional reputation.

203.    ManTech's stated reasons for its actions are pretext for retaliation.

204.    To redress the harms Kevin Cody and Muge Cody have suffered as a result of the acts and conduct of ManTech in violation of 31 U.S.C. § 3730(h), Kevin Cody and Muge Cody are each entitled to damages including two times the amount of back pay, interest on back pay, and compensation for any special damages, including emotional distress, and any other damages available by law including litigation costs and reasonable attorneys' fees.

### Count III: Violations of the Dodd–Frank
### Wall Street Reform and Consumer Protection Act of 2010
### Section 922, 15 U.S.C. § 78u–6(h) Against Defendant

205.    Kevin Cody and Muge Cody re-allege and incorporate the allegations set forth above as though fully alleged herein.

---

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

206.   ManTech is an "employer" as that term is defined by the Dodd–Frank Wall Street Reform and Consumer Protection Act of 2010.

207.   Kevin Cody and Muge Cody both made disclosures to ManTech that are protected under the Sarbanes-Oxley Act of 2002, and are thus protected under Section 922 of Dodd-Frank.

208.   Those disclosures consist of statements by Kevin Cody and Muge Cody to ManTech's leadership that ManTech's underbidding on the contract resulted from failures of ManTech's SEC-required internal financial controls, and this failure of internal controls could harm ManTech's shareholders.

209.   As a result of those disclosures, Kevin Cody and Muge Cody are protected from retaliation by ManTech under Section 922 of Dodd-Frank.

210.   ManTech unlawfully retaliated against Kevin Cody, in violation of Dodd-Frank, for his protected disclosures by significantly diminishing his duties and responsibilities, and harming his professional reputation.

211.   ManTech unlawfully retaliated against Muge Cody, in violation of Dodd-Frank, for her protected disclosures by significantly diminishing her duties and responsibilities, and harming her professional reputation.

212.   ManTech's stated reasons for its actions are pretext for retaliation.

213.   To redress the harms Kevin Cody and Muge Cody have suffered as a result of the acts and conduct of ManTech in violation of Section 922 of Dodd-Frank,

Kevin Cody and Muge Cody are each entitled to damages including two times the amount of back pay, interest on back pay, and compensation for any special damages, including emotional distress, and any other damages available by law including litigation costs and reasonable attorneys' fees.

## **PRAYER FOR RELIEF**

WHEREFORE, the Relators, acting on behalf of and in the name of the United States of America, and on his and her own behalf, pray that judgment be entered against Defendant for violation of the False Claims Act and the Dodd–Frank Wall Street Reform and Consumer Protection Act of 2010 as follows:

1. In favor of the United States against Defendant for treble damages to the Federal Government from the submission of false claims, and the maximum civil penalties for each violation of the False Claims Act;

2. In favor of the Relators for the maximum amount pursuant to 31 U.S.C. § 3730(h) to include reasonable expenses, attorney fees, and costs incurred by the Relators;

3. For all costs of the False Claims Act civil action; and

4. In favor of the Relators and the United States for further relief as this court deems just and equitable; and

FALSE CLAIM ACT *QUI TAM* COMPLAINT UNDER SEAL

CASE NO. _____

The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

5.  Economic damages for lost wages and benefits, including two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the retaliation and reprisal;

6.  Compensatory (non-economic) damages, including but not limited to damages for emotional distress and loss of reputation;

7.  Punitive damages to be determined at trial to punish ManTech for malicious acts of retaliation and to deter it from similar retaliatory conduct toward other employees;

8.  Injunctive or equitable relief, as may be appropriate, to prevent further harm to others and the public caused by ManTech's retaliation against whistleblowers;

9.  Reasonable litigation costs, expert fees, and reasonable attorneys' fees; and

10. Any other such relief that the Court may deem just and equitable.

1

2      Respectfully submitted,
       THE EMPLOYMENT LAW GROUP, P.C.

3

4      By: _____

5      David L. Scher, Esq.
       California Bar No. 184562
6      R. Scott Oswald, Esq. (to be admitted *pro hac vice*)
       The Employment Law Group, P.C.
7      888 17th Street, NW, Suite 900
       Washington, D.C. 20006
8      (202) 261-2802
       (202) 261-2835 (facsimile)
9      dscher@employmentlawgroup.com
       soswald@employmentlawgroup.com
10     *Counsel for the Relators*

11

12

13     Dated:  December 4, 2013.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**The Employment Law Group, P.C.**
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

FALSE CLAIM ACT *QUI TAM* COMPLAINT UNDER SEAL

CASE NO. _____

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was served

via UPS, on this 9th day of December 2013, upon:

Eric Holder, Esq.
Attorney General of the United States
Office of the Attorney General, Civil Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC  20530-0001

Andre Birotte, Esq.
United States Attorney General
United States Attorney's Office
Central District of California
312 North Spring Street
Suite 1200
Los Angeles, California 90012

**Abraham Meltzer, Esq**.
Assistant United States Attorney
Civil Fraud Section
Federal Building, Suite 7516
300 N. Los Angeles St.
Los Angeles, California 90012
Phone: 213-894-7155

Wendy Weiss, Esq.
Chief, Civil Fraud Division
United States Attorney's Office
Central District of California
300 N. Los Angeles St.
Room 7516
Los Angeles, CA 90012
Phone: 213-894-0444

**The Employment Law Group, P.C.**
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

FALSE CLAIM ACT *QUI TAM* COMPLAINT UNDER SEAL

CASE NO. _____

John Lee
Assistant United States Attorney
United States Attorney's Office
Central District of California
300 N. Los Angeles St.
Los Angeles, California 90012
Phone: 213-894-3995

David L. Scher, Esq.
California Bar No. 184562

**The Employment Law Group, P.C.**
888 17th Street, NW, Suite 900
Washington, D.C. 20006
Ph: 202.331.2883 • Fax: 202.261.2835

FALSE CLAIM ACT *QUI TAM* COMPLAINT UNDER SEAL

CASE NO. _____