IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

UNITED STATES OF AMERICA, *ex rel.*, )
KEVIN CODY and MUGE CODY, )
                                 )
                Plaintiffs, )
                                 )
       v.                      )     Civil Action No. 1:16-cv-132 (AJT/JFA)
                                 )
MANTECH INTERNATIONAL )
CORPORATION, )
                                 )
              Defendant. )
_____ )

## MEMORANDUM OPINION

Plaintiffs Kevin and Muge Cody, husband and wife, have filed a retaliation claim under the False Claims Act and the Defense Contractor Whistleblower Protection Act against their former employer, defendant ManTech International Corporation ("ManTech"). The Codys allege that ManTech retaliated against them for questioning the propriety of certain of ManTech's bidding practices in connection with a large government procurement contract from the United States Army, first by diminishing their responsibilities, then ultimately by terminating their employment.

Following the completion of discovery, ManTech filed a motion for summary judgment which the Court took under advisement following a hearing on August 19, 2016. For the reasons stated herein, ManTech's motion will be GRANTED in part and DENIED in part. The motion will be GRANTED with respect to plaintiffs' claims for retaliation based on conduct other than the filing of this action on the grounds that, as a matter of law, plaintiffs did not otherwise engage in conduct that constituted "protected activity" for the purposes of a cognizable retaliation claim. The motion will be DENIED with respect to plaintiffs' claims for retaliation as

a result of the filing of this *qui tam* lawsuit.  There is no dispute that plaintiffs' filing of this action constituted "protected activity" and that their subsequent termination constituted an "adverse" employment action.  Accordingly, the case will proceed to trial on the issue whether plaintiffs' filing of this action was a "contributing factor" to their termination by ManTech.

## I. PROCEDURAL HISTORY

Plaintiffs originally filed this *qui tam* action under seal on December 12, 2013 in the United States District Court for the Central District of California alleging three causes of action against ManTech: (i) a violation of the False Claims Act, 31 U.S.C. §3729 *et seq.* (the "FCA") in the course of bidding for and performing a contract for the United States Army Tank-Automotive and Armaments Command ("TACOM"); (ii) retaliation in violation of the FCA, 31 U.S.C. §3730(h) for attempting to prevent ManTech's alleged FCA violations; and (iii) retaliation under the Dodd-Frank Wall Street Reform and Consumer Protection Act, 12 U.S.C. §§ 5301 *et seq.* *See generally* [Doc. No. 1].

On November 18, 2014, the Government filed a notice declining to intervene in this action and the suit was unsealed on November 21, 2014.  [Doc. Nos. 15, 16].  ManTech thereinafter filed a motion to transfer the case to this District, which the Central District of California granted by order dated February 9, 2015.  [Doc. No. 29].  ManTech moved to dismiss plaintiffs' original complaint on February 25, 2016.  [Doc. No. 35].  On March 16, 2016, plaintiffs filed their First Amended Complaint [Doc. No. 43] (the "Complaint").  In the Complaint, plaintiffs have eliminated any claim that ManTech had violated a substantive provision of the FCA and allege only claims for retaliation in violation of the FCA's anti-retaliation provision, 31 U.S.C. § 3730(h), and the Defense Contractor Whistleblower Protection

Act ("DCWPA"), 10 U.S.C. § 2409.[1]  ManTech moved for summary judgment on June 30, 2016 [Doc. No. 54] (the "Motion") and the Court held a hearing on the Motion on August 19, 2016 [Doc. No. 72].[2]

## II. FACTUAL RECORD

Unless otherwise stated herein, the following are undisputed facts or are disputed facts viewed most favorably to plaintiffs:

The Codys are former executives of ManTech, a multinational government contractor specializing in providing technological services to the United States Government, including its armed services.  Kevin Cody began his employment with ManTech in 1990 and was terminated by ManTech effective March 20, 2015.  Compl. ¶¶ 32, 255.[3]  Muge Cody began her employment with ManTech in 2001 and was terminated effective July 1, 2015.  *Id.* ¶¶ 37, 260. ManTech placed both the Codys on administrative leave on January 12, 2015, after being served in this action on January 8, 2015.  The Codys remained on administrative leave until their respective terminations.

The context surrounding the Codys' retaliation claims is ManTech's contract with the U.S. Army, through TACOM, for the maintenance in Afghanistan and Kuwait of Mine Resistant

[1] The parties refer to 10 U.S.C. § 2409 as the National Defense Authorization Act (the "NDAA").  *See* Compl. ¶ 284.  10 U.S.C. § 2409 is, in fact, the Defense Contractor Whistleblower Protection Act, which was amended by the NDAA.

[2] In related proceedings, on July 10, 2015, plaintiffs filed a Sarbanes-Oxley Act retaliation complaint against ManTech with the United States Department of Labor, Occupational Safety and Health Administration, and on July 31, 2015, a complaint with the United States Department of Defense, Office of Inspector General, alleging retaliation pursuant to the DCWPA.  ManTech responded to these administrative complaints.

[3] The Court's references to the Complaint's allegations are intended simply to summarize facts that are undisputed or otherwise appear in the record, either as direct evidence or reasonable inferences, when viewed most favorably to plaintiffs.

Ambush Protected ("MRAP") vehicles, which are designed to withstand improvised explosive devices and tactical ambushes. TACOM had awarded ManTech numerous sole source contracts with respect to that work since at least 2008, but in 2011, ManTech was required to compete for the continuation of its MRAP work. ManTech submitted its initial competitive bid on September 23, 2011. TACOM awarded ManTech the contract on May 31, 2012.[4] The awarded contract, Contract W56HZV-12-C-0127 (the "MRAP Contract" or the "Contract"), was a "cost-reimbursement" contract worth $2.85 billion in revenues to ManTech over five years and constituted at that time ManTech's largest and most lucrative contract. Management of the MRAP Contract was assigned to Kevin Cody's "business unit"; Muge Cody served as Program Manager for the Contract along with others in her Program Management Office ("PMO").

### A.     The MRAP Contract Issues

As of 2011, ManTech employees deployed in Afghanistan were paid for 84 hours of work each week (12 hours per day, 7 days per week). In addition to base pay, ManTech paid certain employees premiums for being deployed to hazardous and isolated locations. At that time, deployed employees were paid both a "Haz" premium and an "Iso" premium (collectively "Haz/Iso") for each of the 84 hours worked each week. For employees in Afghanistan, each of these premiums amounted to 35% of base pay. In order to lower its overall bid and thereby position itself more competitively, ManTech's initial September 2011 competitive bid proposal included costs for Haz/Iso premium for only 40 of the 84 hours that employees were working.

Following the submission of initial bids, TACOM opened discussions with the offerors and utilized written Evaluation Notice Discussions ("ENDs") to clarify or revise certain aspects

---

[4] Following TACOM's awarding the MRAP Contract to ManTech, a bid protest was filed by a competing bidder. That protest was resolved in ManTech's favor on September 21, 2012.

4

of the offerors' proposals. During this process, the Army questioned—via END Control Number END-MTT-CP-039A ("END 039A")—whether ManTech could retain its incumbent MRAP technician workforce to perform the Contract if it only paid Haz/Iso premiums on the first 40 hours worked each week rather than on all 84. After receiving TACOM's END 039A, ManTech proposed a "retention premium" that would be paid to incumbent employees during the first 14 months of contract performance to offset the reduction in Haz/Iso pay. ManTech represented that the cost of the retention premium would be included as part of its fringe benefits pool, categorized for accounting purposes as an "indirect cost." In that regard, ManTech had established in 2011, with government approval, a Global Contingency Operations ("GCO") cost center, which generated the applicable indirect rate for the MRAP Contract.[5] ManTech also projected a reduction in its direct labor ("DL") rates to the level at which it had most recently been able to hire employees on the existing contract.

In response to ManTech's ongoing bid revisions with regard to END 039A, and specifically ManTech's proposal to include a retention premium to make up for the deficit in Haz/Iso pay, TACOM issued to ManTech another END: END Control Number END-MTT-CP-039B ("END 039B"). In END 039B, TACOM requested information regarding ManTech's "new 'Retention Premium' to incumbent employees with associated costs as part of its Fringe Pool." [Doc. No. 55, Ex. 1 at 1]. In response to this second END, ManTech disclosed that the retention premium had a projected cost of $37.9 million. [*Ibid.*]. In late April 2012, ManTech submitted a "final revised proposal" ("FRP") to TACOM incorporating those disclosures.

---

[5] The GCO cost center included indirect costs for the MRAP Contract and certain other contracts.

TACOM awarded ManTech the MRAP Contract on May 31, 2012 and ManTech began performing under the Contract in that fall. Shortly after the Contract award, TACOM directed ManTech to "ramp up" its manpower to levels beyond those assumed in its initial contract bid and FRP due to increased troop activity in Iraq and Afghanistan. Later, in 2013, TACOM directed ManTech to decrease its labor force dramatically in connection with the "drawdown" of forces in Afghanistan. By letter dated October 29, 2013, ManTech formally requested approval to merge its GCO cost center with another indirect cost center, the IS cost center, retroactive to January 1, 2013. The Government approved this request by letter dated August 7, 2014.

### B.      The Codys' Internal Communications Concerning ManTech's MRAP Contract Bids

Both before and after the MRAP Contract award in May 2012, the Codys, and Kevin Cody in particular, raised issues concerning the extent to which ManTech had disclosed to the Army all of the costs it anticipated in connection with performance under the MRAP Contract. Beginning in early March 2012 through April 2012, Kevin Cody raised his concerns within ManTech while ManTech was in the process of revising its initial September 2011 proposal and responding to TACOM's END inquiries. Specifically, on March 6, 2012, during a meeting to discuss MRAP premium costs with Claude Etzler, ManTech's Vice President of Financial Operation and Compliance, Kevin Cody stated that the MRAP premium costs should be higher in ManTech's FRP to the Army. On March 22, 2012, Louis Addeo, President of ManTech's Technical Services Group, sent an e-mail to Kevin Cody in which he asked Cody for a "position paper" concerning the impending MRAP bid, including, in particular, "what is [the] issue, how are we addressing, what is [the] consensus, what are your concerns, other?" Later that day, Cody replied that "[t]he plan as agreed earlier this week takes monies out of the [direct labor] rate and

places an added 'premium' in the Fringe [benefit] pool . . . [direct labor] rates have been driven

down by our attempt to get closer to bid 'compensation,' there is no group of employees looking

to work in Afghanistan for <$100K." In his response, Cody additionally acknowledged that

ManTech "satisfied TACOM with our response to END [039B]." Finally, Cody observed that

"[a]t this time, I believe that outside of BU[6] and [Muge Cody's division] I may be the only one

concerned. All others seem too concerned with lowering the bid price." [Doc. No. 65, Exs. 1,

9].

Two days later, on March 24, 2012, Kevin Cody sent an e-mail to the MRAP team in

which he stated "I am advocating that we remain at our February price submission" but further

acknowledged that "we finally satisfied the Government . . . with our response to [END 039B] . .

. (proof of satisfaction is no further ENs issued)[.]" [*Id.*, Ex. 10]. Later that evening, the MRAP

team held a conference call, memorialized in March 25 e-mail minutes from Bonnie Cook,

ManTech's Senior Vice President of Business Operations. In that e-mail, Cook stated that based

on the previous evening's conference call, "we will proceed as follows: 1) revise [direct labor]

rates for our current avg.[;] 2) include retention premiums for the first 14 months of performance

to keep all employees['] comp packages whole." She also wrote: "[f]inal notes for the record–

Kevin [Cody] emphasized his concerns regarding the risks identified above as well as his

position on the total comp required for performance behind month 14." [*Id.*, Ex. 11].

The next morning, March 25, 2012, Cody wrote to the team stating "[t]he bottom line is

changing our internal negotiated rates and compensation increases risk to our proposal . . . [t]here

is no real reduction in marketplace compensation. [I]t is artificial as it is based on the DL, which

---

[6] "BU" in this context refers to "business unit," a term that the Codys and others on the MRAP team used to refer to the particular division within ManTech responsible for overseeing the MRAP Contract.

is only one component of three (DL, hours, and Haz/Iso rates) that drive total compensation for .
. . personnel." [*Ibid.*]. Approximately two hours later, Cody e-mailed Addeo separately, stating
that "[t]he proper way to address the reduction in compensation would be to reduce the $ value
added as a 'premium,' which is where the reduction occurred. I feel the team does not want to
do this as they are looking to still reduce to a target that changed." [*Id.* Ex. 12]. Cody concluded
by stating that "[b]ottom line, there is a risk to changing our price; it took us too many ENs and
discussions for us to satisfy the Government." [Doc. No. 55, Ex. 3].

The next day, March 26, Cody sent another "point paper" to Addeo expressing his
thoughts. Later that morning, however, Addeo gave the green light to the MRAP team to
"proceed with the current recommendation on the table," despite Cody's concerns and
observations. [Doc. No. 65, Ex. 14]. Cody reacted to this decision in an e-mail to Addeo in
which he stated that "I would have expected that [I] would be included in an objective
discussion. For the record note that the proposal on the table does not include all the $s to make
employees whole. It contains $27m of $39m . . . I still believe we have injected risk by changing
what we have finally defended; time will tell . . . hopefully no further ENs." [*Ibid.*].

From March 26, 2012 until April 17, 2012, there do not appear in the record any further
communications from either Kevin or Muge Cody concerning the MRAP Contract. On April 17,
as ManTech was finalizing its FRP for submission to TACOM, Bonnie Cook wrote an e-mail to
Kevin Cody stating that "[w]e have reviewed any additional steps we could take to reduce our
pricing, especially in light of the drawdown [of ground forces in Afghanistan]. Attached is a
proposed pricing approach for the FRP submittal." [Doc. No. 65, Ex. 15]. Early the next
morning, April 18, Kevin Cody replied that "[w]e should not take one element of compensation,

8

DL, and state that we have hired personnel at the compensation package that will be derived during the future contract. We have had this discussion many times before. Bottom line[] is any reduction in our price in FPR [*sic*] will increase our risk, and ultimately result in the Government raising our bid." [*Ibid.*]. In her reply to Kevin Cody, Cook stated:

> What we believe occurred on the [competitive] bid is that [the other bidder] made assumptions about the drawdown. That is a fact based in reality now and a changed condition from what existed when the [] bid process began. We have not ever addressed the drawdown in our solutioning for this bid and there is no doubt other bidders did. We need to stay focused on the source selection process.

[Doc. No. 65, Ex. 16]. The next day, April 19, in another e-mail to the MRAP team, Kevin Cody stated that he "[w]as looking at the DL rates again, and realize that the DL rates for the first 14 months . . . did not have the fringe applied . . . I am not advocating that we hold at the current bid, I just want to ensure total transparency." [*Ibid.*].[7] The MRAP team decided to proceed with a reduced labor rate, without the revisions that Kevin Cody had been advocating. On April 24, 2012, ManTech submitted its FRP with that pricing. TACOM awarded ManTech the MRAP Contract on May 31, 2012, and the Contract began in September 2012. In sum, the Codys' concerns are summarized in a January 29, 2013 e-mail to ManTech's compliance department in which Kevin Cody wrote:

> . . . ManTech failed to adequately increase the premium fringe rate, with the result that millions of dollars that should have been included in the proposal were not included. The rate was not adequate to cover known expenses.
>
> I have since learned that the proposed fringe rate is in fact inadequate and rates have outpaced the bid as I suspected. I also have shared my concerns that DL

---

[7] Kevin Cody points to these April 19 communications as an indication that "I was certainly adamant that we were not putting those [fringe] costs into the contract, costs that we needed" and that he believed that ManTech's particular use of the direct labor rate in its FRP was "improper." [Doc. No. 65, Ex. 8].

rates were too low in the proposal because they were based on greening efforts prior to proposal and award.[8]

Muge and I both shared our concerns that the costs proposed to cover indirect personnel were insufficient because it only showed 14 personnel in PMO when there were 60. I believe that these failures during the proposal period and after award have impacted ManTech's [i]nternal/financial controls and accounting.

[Doc. No. 55, Ex. 5].[9]

The Codys allege that almost immediately after TACOM awarded ManTech the MRAP Contract in May 2012, ManTech began to retaliate against them. *See generally* Compl. ¶¶ 143-52. Beginning in May 2012, ManTech excluded Kevin Cody from meetings which he normally would have attended and assigned another employee to oversee a different government contract proposal which Cody normally would have supervised. During fall 2012, while ManTech was beginning to execute the newly-awarded MRAP Contract, ManTech failed to provide the resources Muge Cody required to perform her duties as a PMO officer overseeing the Contract. Then, on December 19, 2012, ManTech informed Kevin Cody that it was removing the MRAP

---

[8] "Greening efforts" refers to the practice of replacing turnover in the labor force with replacements at lower compensation rates.

[9] In the Complaint, the Codys summarize their perceived inadequacies in ManTech's bid as follows:

> [B]ecause ManTech . . . did not fully account for the [retention premium] in the proposal . . . ManTech began billing the U.S. Government for the accrued additional labor premium pay as Variance Costs, even though the charges were anticipated before the contract award, rather than the result of a fluctuation in operating costs. ManTech billed these costs as Variance Costs because when the premium pay was billed as Fringe Costs, as the proposal indicated, it caused the Fringe Rate to be substantially higher than proposed . . . [o]ver the duration of the MRAP contract, ManTech improperly billed the government for at least several million dollars for the labor premium as "Variance Costs."

Compl. ¶¶ 170-74.

10

Contract from within his business unit due to an internal reorganization.[10] This transfer of the

MRAP Contract reduced revenues in Kevin Cody's business unit from approximately $500

million to $20 million.  ManTech also, on December 19, 2012, relocated Muge Cody's PMO

division into a separate business unit, separating Muge Cody from her MRAP oversight

responsibilities.[11]  In January 2013, the Codys heard rumors that ManTech's executives were

stating that they planned to resign.  Additionally, Muge Cody began to be excluded from various

meetings and communications, and was subjected to an "unusually high level of scrutiny."

Compl. ¶¶ 199, 205, 207.  On January 29, 2013, the Codys each sent e-mails to Terry Myers,

ManTech's Senior Vice President of Compliance, and Steve Wynne, Senior Compliance Officer.

In those e-mails, the Codys stated that they had no intention to resign but were concerned about

retaliation "because of legitimate complaints we've made about ManTech's [i]nternal/financial

controls and accounting during the MRAP [] proposal and bidding process."  [Doc. No. 55, Ex.

5].  They also requested that Myers "[p]lease review our concerns [about the MRAP Contract]

and take appropriate action, and ensure that Muge and I do not suffer any retaliation for raising

our concerns."  [*Ibid.*].

The Codys met with Myers on February 7, 2013.  During that meeting, the Codys

expressed their belief that ManTech's recent business reorganization—specifically relocating

Muge Cody's PMO divison and removing the MRAP Contract from Kevin Cody's business

unit—were retaliatory actions.  On March 26, Muge Cody sent an e-mail to ManTech's human

resources division complaining that she had been excluded from certain communications.  In

---

[10] Kevin Cody was informed of this change by two of his supervisors, Louis Addeo and Daniel
Keefe, Executive Vice President of ManTech's Technical Services Group.

[11] When ManTech removed the MRAP Contract from Muge Cody's purview, it partially justified
the action by expressing that it was improper for Kevin Cody to manage his wife.  The Codys
allege that this reason was pretext for retaliation.

May 2013, the Codys again met with Myers and others in ManTech's compliance department to review the Codys' allegations. The compliance department informed the Codys that after review, it had not encountered any suspect activity with regard to the labor rates about which the Codys expressed concern in 2011 and 2012.

On June 13 and again on June 20, 2013, Muge and Kevin Cody sent two additional e-mails, respectively, to ManTech's human resources division complaining of harassment, bullying, blame-shifting, and their recent perceived demotions. On June 26, 2013, Daniel Keefe, who had replaced Louis Addeo as President of ManTech's Technical Services Group, authored a memorandum to Muge Cody in which he stated that he had found no evidence of compliance irregularities or unlawful retaliation. On July 12, the Codys responded in an e-mail that "[we] disagree with the determinations and formally request some explanation of how those determinations were made." [Doc. No. 55, Ex. 13].

On October 9, 2013, Kevin Cody met with Keefe and ManTech's CFO, Kevin Phillips. At that meeting, Keefe advised Cody that ManTech would be consolidating Cody's business unit with another business unit headed by a different ManTech executive, Richard Simis. Keefe and Phillips explained that the reorganization was due to "business realities," specifically, that the existing revenues within his business unit, approximately $20 million, did not justify its existence as a separate business unit. Kevin Cody perceived this decision as an additional retaliatory consequence of the decision to remove the MRAP Contract from his business unit. That month, ManTech transferred Cody from his position in the Technical Services Group to a new position in ManTech's corporate headquarters as Corporate Senior Vice President of

Operations Support and Market Expansion, a job that, according to Cody, "really wasn't a job." [Doc. No. 65, Ex. 8].

The Codys filed this *qui tam* lawsuit on December 4, 2013.  In April 2014 and throughout the summer and fall of 2014, Kevin Cody continued to complain about ManTech's treatment of him and his belief that he was suffering from retaliation.[12]  In those communications, Cody reiterated his previous year's concerns regarding ManTech's labor rate accounting for the MRAP Contract and the business reorganizations that affected his and Muge Cody's responsibilities over the MRAP Contract.  He also complained about the size of the increase in his annual base salary, his stock option award, and his 2013 bonus.  ManTech's compliance group investigated Codys' complaints insofar as they alleged potential "FAR violation[s] or fraud with respect to ManTech's . . . cost segments in 2013" and concluded that no improper nondisclosure or other violations had occurred.  *See generally* [Doc. No. 55, Ex. 20] (Declaration of Terry G. Myers).

In May 2014, James Maguire, who had served as ManTech's Vice President of Financial Operations and Technical Services Group Compliance during the MRAP bidding competition, contacted Bonnie Cook (ManTech's Vice President for Business Operations) and told her that an investigator from the Department of Defense's Office of Inspector General had contacted him about a potential fraud relating to the MRAP Contract.  A few months later, on October 7, 2014, Kevin Cody sent an e-mail titled "New Concerns; CLSS and previous TACOM contracts" to Terry Myers, who understood that Cody was claiming that "there had been some sort of

---

[12] The record reflects that Kevin Cody (i) authored e-mails to ManTech's internal compliance department expressing his complaints and concerns on (a) April 29, 2014 [Doc. No. 55, Ex. 14]; (b) May 13, 2014 [*id.*, Ex. 16]; (c) July 15, 2014 [*id.*, Ex. 17]; (d) July 23, 2014 [*id.*, Ex. 18]; (e) October 7, 2014 [*id.*, Ex. 19]; (f) October 31, 2014 [*ibid.*]; and (g) December 16, 2014 [*ibid.*]; and (ii) had private meetings with ManTech executives about his complaints and concerns on (h) May 5, 2014 [*id.*, Ex. 15]; (*i*) June 27, 2014 [*id.*, Ex. 17]; and (j) October 8, 2014 Compl. ¶ 248.

unspecified FAR violation or fraud with respect to ManTech's merger of its GCO and IS cost segments in 2013." [*Id.* at 1]. Myers subsequently discussed with Cody the concerns expressed in this e-mail.

On November 21, 2014, the Codys' original complaint in this action was unsealed. On December 23, 2014, counsel for the Codys sent a letter to ManTech instructing it to preserve evidence related to the Codys' claims against ManTech for violations of the FCA and related statutes. On January 8, 2015, the Codys, by counsel, served ManTech with a copy of the original complaint. Four days later, on January 12, 2015, ManTech informed the Codys that it was performing an internal investigation into whether ManTech had committed any FCA violations and that it was placing them on paid administrative leave during the pendency of that investigation. The decision to place the Codys on leave was made by ManTech CFO Kevin Phillips, in consultation with Margo Mentus (in human resources) and outside counsel.

On March 6, 2015, ManTech notified Kevin Cody that he would be terminated effective March 20, 2015, based on the Army's drawdown and concomitant "reduction in force." This decision was made by the same three individuals who had made the decision to place Cody on administrative leave, and was additionally approved by ManTech's chairman and CEO, George Pedersen. ManTech did not consider Kevin Cody, despite his qualifications, for two positions within ManTech as an alternative to termination: as Army Business Unit President, a position vacant since January 2015; and for a new business unit leadership position for which ManTech posted an opening on March 23, 2015, three days after Cody was terminated. Three months later, on June 17, 2015, ManTech informed Muge Cody that she would be terminated effective

14

July 1, 2015, also due to the reduction in force, a decision made by Phillips, Mentus, Keefe, and outside counsel.

## II. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate only if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Evans v. Techs. Apps. & Serv. Co.*, 80 F.3d 954, 958-59 (4th Cir. 1996). The party seeking summary judgment has the initial burden to show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). The facts shall be viewed, and all reasonable inferences drawn, in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *see also Lettieri v. Equant Inc.*, 478 F.3d 640, 642 (4th Cir. 2007). To defeat a properly supported motion for summary judgment, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. Whether a fact is "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Ibid.*

## III. ANALYSIS

Plaintiffs assert retaliation claims in each of the Complaint's two counts: under the FCA, 31 U.S.C. § 3730(h) (Count 1); and under the DCWPA, 10 U.S.C. § 2409 (Count 2). The FCA's anti-retaliation provision provides:

> Any employee, contractor, or agent shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h)(1).[13]  The DCWPA similarly prohibits retaliation "for disclosing . . . a violation of law, rule, or regulation related to a Department [of Defense] contract (including the competition for or negotiation of a contract) or grant." 10 U.S.C. § 2409(a)(1)(A).[14]

---

[13] In its current form, 31 U.S.C. § 3730(h) reflects substantive amendments implemented by the Fraud Enforcement and Recovery Act of 2009 ("FERA"). The Fourth Circuit has summarized these amendments as follows:

> Since the distinct possibility standard was adopted, § 3730(h) has been amended twice, once in 2009 and again in 2010. The 2009 amendment struck the reference to a FCA action altogether, describing protected activity as "lawful acts done . . . in furtherance of other efforts to stop 1 or more violations" of the FCA. Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, 123 Stat. 1617, 1624-25 (2009). The new provision was grammatically incorrect, however, as the word "other" was extraneous—the provision only covered "other efforts to stop [a] violation." *Id.* Congress amended § 3730(h) again in 2010, Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. 111-203, § 1079A(c), 124 Stat. 1376, 2079 (2010), adding back some of the previously excised language. The provision now covers employee conduct "in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h).

*Carlson v. DynCorp Int'l LLC*, No. 14-1281, --- F. App'x ---, 2016 WL 4434415, at *3 (4th Cir. Aug. 22, 2016).

[14] 10 U.S.C. § 2409 provides, in pertinent part, as follows:

16

Importantly, under the DCWPA, a whistleblower employee is entitled to relief for retaliation if he or she demonstrates that a protected activity was a "contributing factor" in the "personnel action which was taken" and that "the official taking the personnel action knew of the . . . protected activity." 5 U.S.C. § 1221(e)(1).[15] The employee may demonstrate such a causal connection through circumstantial evidence such as temporal proximity, but the employee is not entitled to relief if the employer "demonstrates by clear and convincing evidence that it would have taken the same personnel action in the absence of such disclosure." *Id.* § 1221(e)(1)(B), (2). Based on these statutes, in order to establish a *prima facie* case of unlawful retaliation, a whistleblower plaintiff must establish that: (1) he engaged in "protected activity"; (2) his employer knew or was reasonably on notice that he was engaged in protected activity; and (3) his

---

(a) Prohibition of reprisals—

(1) An employee of a contractor . . . may not be discharged, demoted, or otherwise discriminated against as a reprisal for disclosing to a person or body described in paragraph (2) information that the employee reasonably believes is evidence of the following:

(A) Gross mismanagement of a Department of Defense contract or grant, a gross waste of Department funds, an abuse of authority relating to a Department contract or grant, or a violation of law, rule, or regulation related to a Department contract (including the competition for or negotiation of a contract) or grant.
. . .
(2) The persons and bodies described in this paragraph are the persons and bodies as follows:
. . .
(G) A management official or other employee of the contractor or subcontractor who has the responsibility to investigate, discover, or address misconduct.

[15] 5 U.S.C. § 1221(e) is made applicable to retaliation claims under 10 U.S.C. § 2409 through the operation of 10 U.S.C. § 2409(c)(6), which provides that "[t]he legal burdens of proof specified in section 1221(e) of title 5 shall [control] any . . . judicial . . . proceeding to determine whether discrimination prohibited under this section has occurred." Further, a retaliation claim under 10 U.S.C. § 2409 or the FCA is subject to the *McDonnell Douglas* burden-shifting analysis developed under Title VII of the Civil Rights Act. *See Dillon v. SAIC, Inc.*, 2013 WL 324062, at *9 (E.D. Va. 2013) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

employer took adverse action against him as a result of his protected activity. *See Glynn v. EDO Corp.*, 710 F.3d 209, 214 (4th Cir. 2013); *Eberhardt v. Integrated Design & Const., Inc.*, 167 F.3d 861, 866 (4th Cir. 1999).

### A.    "Protected Activity"

As to the first element of the *prima facie* test, there are two types of "protected activity" under the FCA as amended by the Fraud Enforcement and Recovery Act ("FERA"). The first is conduct "in furtherance of an [FCA] action." The second is conduct constituting "other efforts to stop 1 or more violations" of the FCA. 31 U.S.C. § 3730(h)(1); *see supra* n.13. The Court has found no case interpreting the scope of "protected activity" under 10 U.S.C. § 2409 but given the DCWPA's statutory language ("disclosing . . . a violation of law, rule, or regulation"), the DCWPA would appear to include as "protected activity" any conduct protected under the FCA.

The filing of a lawsuit or administrative complaint claiming a violation of the FCA or similar statutes, as plaintiffs have done, is clearly "protected activity" under either the FCA as amended by FERA or the DCWPA. But the filing of a lawsuit is not *required* under either statute, and plaintiffs' retaliation claim is based not only on the filing of this action, but also on their internal communications within ManTech before the filing of the action, specifically during the period from March through April 2012, and again beginning in January 2013, after the MRAP Contract was awarded to ManTech.

In determining whether such internal communications constitutes "protected activity," courts have focused on two aspects of the relied-upon conduct. The first aspect is whether an employee, no matter how he characterizes the employer's conduct, had a good faith belief that the employer was engaging in unlawful conduct. In making that assessment, a court will

18

consider whether (1) the employee in good faith believes, and (2) a reasonable employee in the same circumstances would believe, that the employer is committing fraud against the Government. *See U.S. ex rel. Wilson v. Graham Cnty Soil & Water Conser. Dist.*, 367 F.3d 245, 255 (4th Cir. 2004), *rev'd on other grounds*, 545 U.S. 409 (2005);[16] *see also Allen v. Admin. Review Bd.*, 514 F.3d 468, 477 (5th Cir. 2008) ("[t]he objective reasonableness of a belief is evaluated based on the knowledge available to a reasonable person in the same factual circumstances with the same training and experience as the aggrieved employee").

The second aspect is whether the employee has used language that, under the relevant circumstances and within the specific context in which the communications were made, puts an employer on reasonable notice that the employee is bringing to its attention conduct that qualifies as "protected activity" under either the FCA or the DCWPA; in other words, language sufficient to let an employer know that its whistleblower employee is actually blowing a whistle. One measure to determine whether this requirement is satisfied is the "distinct possibility" standard, described as follows:

> [A]n employee tasked with the internal investigation of fraud against the government cannot bring a section 3730(h) action for retaliation unless the employee puts the employer on notice that a *qui tam* suit under section 3730 is a reasonable possibility. Such notice may be accomplished by expressly stating an intention to bring a *qui tam* suit, but it may also be accomplished by any action which a factfinder reasonably could conclude would put the employer on notice that litigation is a reasonable possibility. Such actions would include, but are not limited to, characterizing the employer's conduct as illegal or fraudulent or recommending that legal counsel become involved. These types of actions are sufficient because they let the employer know, regardless of whether the employee's job duties include investigating potential fraud, that litigation is a reasonable possibility.

---

[16] A similar approach is utilized in assessing retaliation claims under other statutes. *See, e.g., Welch v. Chao*, 536 F.3d 269, 278 n.4 (4th Cir. 2008) (Sarbanes-Oxley); *Jordan v. Alt. Res. Corp.*, 458 F.3d 332, 340-41 (4th Cir. 2006) (Title VII).

*Eberhardt*, 167 F.3d at 868.   But post-FERA, the 'distinct possibility' standard "is no longer the

(only) standard for identifying protected activity under [the FCA]." *Carlson*, 2016 WL 4434415,

at *4.  In that regard, the Fourth Circuit recently concluded, albeit "without deciding," that "the

second prong of §3730(h) [that added in 2009 by FERA] makes 'efforts to stop 1 or more

violations' protected activity where those efforts are motivated by an objectively reasonable

belief that the employee's employer is violating, or will soon violate, the FCA." *Ibid.*[17] (citing

*Fanslow v. Chi. Mfg. Ctr., Inc.*, 384 F.3d 469, 480 (7th Cir. 2004));[18] *see also Wilkins v. St. Louis*

*Hous. Auth.*, 314 F.3d 927, 933 (8th Cir. 2002); *Moore v. Cal. Inst. of Tech. Jet Propulsion Lab.*,

275 F.3d 838, 845 (9th Cir. 2002); *Jones-McNamara v. Holzer Health Sys.*, 630 F. App'x 394,

399-400 (6th Cir. 2015).

Likewise, protected activity under the DCWPA would include a "disclosure" that places

an employer on objectively reasonable notice that what is being disclosed is a "violation of a

law, rule, or regulation related to a Department [of Defense] contract (including the competition

for or negotiation of a contract) or grant." 10 U.S.C. § 2409(a)(1).  For these reasons,

expressions of concern that do not raise the reasonable prospect of false or fraudulent claims

under the FCA, or violations of an applicable law, rule, or regulation under the DCWPA, do not

constitute "protected activity." *See Zahodnick v. Int'l Bus. Mach. Corp.*, 135 F.3d 911, 914 (4th

Cir. 1997) ("[s]imply reporting [] concern of a mischarging to the government to [one's]

---

[17] That standard would appear to duplicate the "objectively reasonable, good faith belief" requirement, discussed as the first aspect of any "protected activity" analysis.

[18] The Fourth Circuit has also noted that "an objectively reasonable belief standard aligns with our treatment of similarly structured whistleblower provisions in Title VII, the Age Discrimination in Employment Act, and the Americans with Disabilities Act." *Carlson*, 2016 WL 4434415, at *4.

supervisor does not suffice to establish that [the employee] was acting 'in furtherance of' a *qui tam* action" for the purposes of the FCA).

### B.   Retaliation Based on Conduct Other than the Filing of this Action.

Upon consideration of the record, measured against these standards, the Court first concludes as a matter of law that plaintiffs have not produced evidence sufficient to establish that they engaged in "protected activity" other than the filing of this action.  First, none of plaintiffs' communications before January 2013 would have caused ManTech to understand or be on objectively reasonable notice that (i) litigation was a "distinct" or "reasonable" possibility; (ii) plaintiffs were engaged in efforts motivated by an objectively reasonable belief that ManTech was violating, or would soon violate, the FCA; or (iii) plaintiffs were disclosing a "violation of an applicable law, rule, or regulation."  While the Codys may have subjectively believed that the conduct in which ManTech was engaging was "illegal" or "fraudulent," and that their communications put ManTech on notice that what the Codys were describing was—in the words of Kevin Cody—"definitely fraud," the Codys, by their own admission, never characterized the accounting issues they raised as fraudulent, illegal, or even improper.  The substance of their communications would therefore not have reasonably placed ManTech on notice of those beliefs.  Rather, plaintiffs raised those issues as items of "concern" within the context of multifaceted accounting issues, business judgments, market condition projections and changing Army troop deployments.  At most, plaintiffs' communications constituted "simply reporting a concern of mischarging to the government to [one's] supervisor."  *See United States ex rel. Garzione v. PAE Gov't Servs., Inc.*, --- F. Supp. 3d ---, 2016 WL 775780, at *8 (E.D. Va. Feb. 25, 2016) (collecting cases).

With respect to communications after January 2013, the Court finds that certain of plaintiffs' communication with ManTech's compliance officers placed ManTech on notice that plaintiffs were raising issues of potentially illegal or unlawful conduct, as evidenced by ManTech's own internal investigation into such issues. Insofar as plaintiffs claim retaliation after January 2013, they therefore satisfy the second prong of the retaliation analysis. Nevertheless, the Court concludes on the record before it that, as a matter of law, the issues of improper conduct that plaintiffs' complaints caused ManTech to investigate after January 2013 were not based on an objectively reasonable belief that unlawful, improper, or fraudulent conduct had or would occur. Plaintiffs have therefore failed to satisfy the first prong of the retaliation analysis. In that regard, it is undisputed that during the bidding process and before the awarding of the MRAP Contract, ManTech fully disclosed to TACOM the cost of the proposed "retention premium" for incumbent employees that caused plaintiffs' concerns. Far from concealing the true costs, as plaintiffs allege, ManTech, in response to END 039B, provided a detailed breakdown explicitly stating that the "impact of the proposed benefit change" amounted to $37.9 million over fourteen months. In testimony, Kevin Cody acknowledges that he was aware of ManTech's response to END 039B and that the $37.9 million amount quoted in END 039B was correct. Likewise, it is undisputed that the Government knew and approved of ManTech's creation of the GCO cost segment in 2011, and knew that (i) the cost of the retention premium was accounted for as an indirect cost through the GCO cost center; (ii) ManTech consolidated the GCO cost segment with the IS cost segment in 2013; and (iii) the retroactive application of the fringe benefits rates was established through that consolidation. *See* [Doc. No.

55, Ex. 20] (Declaration of Terry Myers).  For these reasons, the Court concludes as a matter of law that plaintiffs did not engage in "protected activity," other than the filing of this action.

### C.    Retaliation Based on this Action

It is uncontested that the Codys' filing of this lawsuit constitutes "protected activity," that ManTech was on notice of the lawsuit, and that the Codys' terminations after the filing of that lawsuit constitute "adverse" employment actions.  The remaining issue is whether plaintiffs have presented evidence sufficient to establish that their terminations were causally related to this lawsuit.

A whistleblower plaintiff must prove by a preponderance of the evidence that the alleged protected activity was a "contributing factor" in the adverse employment action taken against him or her.  5 U.S.C. § 1221(e)(1); *Feldman v. Law Enforcement Assocs. Corp.*, 752 F.3d 339, 344 (4th Cir. 2014); *Puffenbarger v. Engility Corp.*, 151 F. Supp. 3d 651, 658 (E.D. Va. 2015).  As the Fourth Circuit stated in *Feldman*:

> A contributing factor is any factor, which alone or in combination with other factors, tends to affect in any way the outcome of the decision.  This element is broad and forgiving, and this test is specifically intended to overrule existing case law, which requires a whistleblower to prove that his protected conduct was a 'significant,' 'motivating,' 'substantial,' or 'predominant' factor in a personnel action in order to overturn that action.  Temporal proximity between the protected activity and the adverse action is a significant factor in considering a circumstantial showing of causation, the causal connection may be severed by the passage of a significant amount of time, or by some legitimate intervening event.

752 F.3d 339, 348 (internal citations, quotations, and alterations omitted).  Under this "broad and forgiving" standard, a plaintiff has "a rather light burden of showing by a preponderance of the evidence that the [protected] activities tended to affect his termination in at least some way." *Ibid.*

Although ManTech does not dispute that it was aware of the Codys' lawsuit, it is unclear from the record precisely when ManTech first knew of or suspected that the lawsuit had been filed, and by whom. In that regard, the record establishes that the Codys filed their lawsuit on December 4, 2013, under seal. In May 2014, six months later, and while the Government was deciding whether to intervene, a Department of Defense OIG investigator contacted James Maguire—a former ManTech executive involved in the MRAP Contract procurement— "about a potential fraud under the MRAP contract."[19] Maguire in turn relayed this information to Bonnie Cook, another ManTech executive. At that time, Cook was aware of the Codys' ongoing expressions of concern with regard to the MRAP Contract in spring 2012.

From May 2014 until the time of their termination, the Codys continued to raise issues concerning the MRAP Contract and retaliation against them, specifically on May 5, May 13, June 27, July 15, July 23, October 7, October 8, October 31, and December 16. *See supra* n.12. The Complaint was unsealed on November 21, 2014. On December 23, 2014, ManTech received a letter from the Codys' counsel directing it to preserve evidence relating to potential FCA claims against ManTech. On January 8, 2015, ManTech was served with the lawsuit. ManTech placed both Codys on administrative leave with pay on January 12, 2015, an action that ManTech concedes was in response to the filing of the lawsuit and the internal investigation it represented that filing triggered, terminated Kevin Cody in March 2015, and terminated Muge Cody in July 2015.

The Codys contend that when all the facts and circumstances pertaining to their interactions with ManTech over a period of years are viewed in a light most favorably to them, both before and after the filing of the this action, a reasonable trier of fact could conclude that

---

[19] The record does not reflect when in May 2014 this interaction occurred.

their filing of this *qui tam* lawsuit was, at least some way, a contributing factor in ManTech's decision to terminate them.  In support of this position, plaintiffs point to (i) the several instances in which ManTech altered their duties and responsibilities after they aggressively and repeatedly raised their concerns about the MRAP procurement and possible retaliation (regardless of whether those communications and employment actions constituted "protected activity" or "adverse" employment actions, respectively); (ii) ManTech's placing them on administrative leave, which ManTech concedes was related to the lawsuit; (iii) ManTech's justification for placing them on administrative leave, which the Codys contend was a pretext for retaliation (viz. the need to conduct an internal investigation it had already conducted); (iv) their increased vulnerability to a termination because of their reduction in responsibilities and administrative leave status; (v) the availability of positions within ManTech to which at least Kevin Cody could have been transferred in compliance with company policy concerning an employee whose position is eliminated; and (vi) the fact that the Codys had sparred over the MRAP Contract with at least some of the individuals involved in the decision to terminate their employment.

ManTech contends that plaintiffs have failed to present evidence sufficient to establish the required causal connection between the filing of their lawsuit and their termination.  In that regard, ManTech argues that the Codys' prior complaints and ManTech's personnel actions, including placing the Codys on administrative leave, are essentially irrelevant since, other than the filing of the lawsuit, the Cody's did not engage in "protected activity" and none of ManTech's personnel actions other than terminating the Codys constitute a cognizable or materially "adverse" employment action for the purposes of a retaliation claim. *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006); *Sturdivant v. Geren*, Case No: 1:09-cv-

586, 2009 WL 4030738, at *6 (E.D. Va. 2009) ("placing an individual on paid administrative

leave does not constitute an adverse employment action in the discrimination context or in the

retaliation context"). ManTech also contends that the "temporal proximity," or time gap,

between the Codys' termination and ManTech's knowledge that the Codys had filed a lawsuit is

too great to establish a *prima facie* case of causation. *See, e.g., Bush v. Hagel*, Case No. 1:12-cv-

1483, 2014 WL 345650, at *8 (E.D. Va. 2014) ("[t]here is no temporal proximity between

[retaliation] and any protected activity, which last occurred approximately nine months earlier").

ManTech further points to other highly probative facts undermining the Codys' claims of

retaliation, such as their receiving routine salary increases, bonuses, and other benefits from

ManTech throughout their employment, including after the filing of the lawsuit or after ManTech

arguably knew about the lawsuit; and that the primary decision maker as to the Codys'

termination, ManTech's CFO Kevin Phillips, was not significantly involved in the Codys'

communications concerning the MRAP Contract.   Lastly, as a safe harbor, ManTech contends

that plaintiffs' terminations were dictated by legitimate business reasons, including the U.S.

Army's drawdown in the Middle East, ManTech's concomitant "reduction in force" and the

Army's elimination of Muge Cody's position as program manager, which resulted in not only

her termination but also that of her deputy.

　　　While a reasonable factfinder could very well conclude that plaintiffs' termination had

nothing to do with any protected activity, when the totality of the facts and circumstances

reflected in the extensive record are viewed most favorably to plaintiffs, together with all

reasonable inferences, the Court cannot conclude that ManTech is entitled to that determination

as a matter of law.   The Court's conclusion is underscored by the legal standard of causation

applicable to plaintiffs' retaliation claim when compared to the "clear and convincing" standard applicable to ManTech's defense. *See Puffenbarger*, 151 F. Supp. 3d at 658 ("[i]f the plaintiff establishes a *prima facie* case [of retaliation], then the defendant may prevail only if it rebuts the employee's *prima facie* case by demonstrating by clear and convincing evidence that the employer would have taken the same personnel action in the absence of the protected activity") (internal quotations and citations omitted).  For these reasons, the Court declines to grant summary judgment in favor of ManTech on plaintiffs' claim that the filing of this action was a contributing factor to their terminations.

### IV. CONCLUSION

For the above reasons, the Court finds and concludes that, as a matter of law, plaintiffs did not engage in any "protected activity" other than the filing of this action and that there are genuine issues of material fact concerning whether ManTech's termination of their employment was causally related to the filing of this action.  Accordingly, ManTech's Motion for Summary Judgment [Doc. No. 54] will be granted as to plaintiffs' claims for retaliation for any conduct other than the filing of this action and will otherwise be denied.

The Court will issue an Order.

The Clerk is directed to forward a copy of this Memorandum Opinion to all counsel of record.

/s/

Anthony J. Trenga
United States District Judge

Alexandria, Virginia
September 14, 2016