IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.*, ) <br> KEVIN CODY and MUGE CODY, ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> MANTECH INTERNATIONAL ) <br> CORPORATION, ) <br> ) <br> Defendant. ) <br> _____) | Civil Action No. 1:16-cv-132 (AJT/JFA) |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is a Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial [Doc. No. 127] (the "Motion"), filed on behalf of Defendant ManTech International Corporation ("ManTech" or "Defendant"). At the conclusion of Plaintiffs' case, ManTech moved for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(a). The Court reserved ruling on this motion. Following Defendant's case, the Court submitted the action to the jury, which returned a verdict against ManTech and in favor of Plaintiffs Kevin Cody ("Mr. Cody") and Muge Cody ("Mrs. Cody") (collectively, the "Codys" or "Plaintiffs") for unlawfully terminating each of them and for compensatory damages for emotional distress in the amounts of $500,000 to Mr. Cody and $300,000 to Mrs. Cody. ManTech timely filed the Motion pursuant to Fed. R. Civ. P. 50(b).

ManTech contends in its Motion that it is entitled to judgment as a matter of law because the evidence presented at the jury trial is insufficient (1) to establish causation between Plaintiffs' filing of this *qui tam* suit and ManTech's terminations of them and (2) to support the award of damages for emotional distress. Alternatively, ManTech contends that (1) the verdicts

are against the weight of the evidence and a new trial should be granted and (2) the damages awards are excessive and should be remitted. For the reasons below, the Motion is GRANTED in part and DENIED in part. It is granted insofar as the Court finds the evidence at trial insufficient to support the jury's compensatory damage awards for emotional distress and is otherwise denied.

## I. BACKGROUND

As the evidence presented at trial, the Codys are former executives of ManTech, a multinational government contractor specializing in providing technological services to the United States Government, including its armed services. Mr. Cody began his employment with ManTech in 1990. He rose steadily within ManTech, eventually becoming President of the Business Unit that managed large contracts with the United States Army Tank-Automotive and Armaments Command ("TACOM") for the maintenance of Mine Resistant Ambush Protected ("MRAP") vehicles in Afghanistan and Kuwait. Mrs. Cody began her employment with ManTech in 2001. Mrs. Cody also did well at ManTech, becoming Vice President in May 2009 and in that role serving as the program manager for the 5-year cost-reimbursement contract for the MRAP program that ManTech secured in May 2012 (the "MRAP Contract"). In 2011-12, the Codys, in particular Mr. Cody, had disputes with other ManTech executives regarding the pricing in ManTech's bids for the MRAP Contract. In short, the Codys believed that reduced pay to the employees working in Afghanistan and Kuwait proposed in the bids would be unsustainable in practice and rendered ManTech's bids misleading.

This dispute persisted, and on December 12, 2013, the Codys filed under seal this *qui tam* action, in which they alleged that ManTech defrauded the United States in violation of the False Claims Act ("FCA"). On November 18, 2014, the United States filed a notice declining to

2

intervene in the suit, which became unsealed on November 21, 2014. On December 23, 2014, counsel for the Codys sent a letter to ManTech instructing it to preserve evidence related to the Codys' claims against ManTech for violations of the FCA and related statutes. On January 8, 2015, the Codys, through counsel, served ManTech with a copy of the original complaint. On January 12, 2015, ManTech informed the Codys that it was performing an internal investigation into whether ManTech had committed any FCA violations and that it was placing them on paid administrative leave during the pendency of that investigation.

On March 8, 2015, Mr. Cody learned that he would be terminated effective March 20, 2015. Kevin Phillips, ManTech's President and Chief Operating Officer, testified that Mr. Cody was terminated, along with a number of other senior executives, due to a sharp decline in ManTech's revenue due to the United States' drawdown in Afghanistan and other arenas. On June 17, 2015, ManTech informed Muge Cody that she would be terminated effective July 1, 2015. Mike Brogan, Senior Vice President at ManTech, testified that ManTech terminated Mrs. Cody because the Army eliminated her MRAP Contract program manager position, along with the deputy program manager position.

On February 25, 2016, ManTech moved to dismiss Plaintiffs' original complaint. In response, the Codys filed their First Amended Complaint on March 16, 2016, in which they abandoned the *qui tam* claim for violation of the FCA. Instead, the Codys asserted only claims for retaliation in violation of the FCA, 31 U.S.C. § 3730(h), and the Defense Contractor Whistleblower Protection Act, 10 U.S.C. § 2409.

On September 14, 2016, the Court granted ManTech's motion for summary judgment on Plaintiffs' claims for retaliation based on conduct other than the filing of this *qui tam* action,

finding that none of the Codys' other relied upon conduct constituted "protected activity" that could sustain a claim for retaliation.

Because there is no dispute that their terminations constituted adverse employment actions, the only issue for the jury to decide with respect to liability was whether there was sufficient causation between the filing of this *qui tam* action and Plaintiffs' respective terminations. At trial, the parties stipulated to the amount of back pay damages each Plaintiff would be entitled to receive should they prevail on the issue of liability and also agreed that in the event of liability, the issue of front pay was for the Court to decide, leaving compensatory damages for emotional distress as the only damages issue for the jury to decide. The jury found that ManTech unlawfully terminated the Codys in retaliation for their filing of this *qui tam* suit and awarded damages for emotional distress in the amount of $500,000 to Mr. Cody and $300,000 to Mrs. Cody.

## II. STANDARD OF REVIEW

Rule 50(b) "tests the legal sufficiency of a claim, that is, it assesses whether the claim should succeed or fail because the evidence developed at trial was insufficient as a matter of law to sustain the claim." *Belk, Inc. v. Meyer Corp.*, 679 F. 3d 146, 155 (4th Cir. 2012). Relief under Rule 50(b) should be granted only if "the plaintiff's case is, as a matter of law, so weak that no rational jury could find in favor of the plaintiff." *Id.* at 161. In deciding a motion under Rule 50(b), the Court must view abide by the following precepts:

> In determining whether the evidence is sufficient the court is not free to weigh the evidence or to pass on the credibility of witnesses or to substitute its judgment of the facts for that of the jury. Instead it must view the evidence most favorably to the party against whom the motion is made and give that party the benefit of all reasonable inferences from the evidence.

*Whalen v. Roanoke Cnty. Bd. of Supervisors*, 769 F.2d 221, 224 (4th Cir. 1985) (internal quotation marks omitted). If there is evidence on which a reasonable jury may find in favor of the plaintiff, the judgment should be affirmed. *Price v. City of Charlotte, N.C.*, 93 F.3d 1241, 1249-50 (4th Cir. 1996); *see also Dennis v. Columbia Colleton Med. Ctr.*, 290 F.3d 639, 645 (4th Cir. 2002) ("if reasonable minds could differ, we must affirm"). Further, "[j]ury verdicts are entitled to the utmost respect." *Lovell v. BBNT Solutions, LLC*, 295 F. Supp. 2d 611, 617 (E.D. Va. 2003) (internal quotation marks omitted).

With respect to a motion for a new trial under Rule 59, a district court can grant a new trial, setting aside the jury's verdict, only if "(1) the verdict is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." *Atlas Food Sys. & Serv., Inc. v. Crane Nat'l Vendors, Inc.*, 99 F.3d 587, 594 (4th Cir. 1996). Review under the first two prongs "encompasses a comparison of the factual record and the verdict to determine their compatibility." *Id.* In deciding such a motion, the district judge "may weigh the evidence and consider the credibility of the witnesses." *Poynter ex rel. Poynter v. Ratcliff*, 874 F.2d 219, 223 (4th Cir. 1989).

"Under Rule 59(a) of the Federal Rules of Civil Procedure, a court may order a new trial nisi remittitur if it concludes that a jury award of compensatory damages is excessive." *Jones v. Southpeak Interactive Corp. of Del.*, 777 F.3d 658, 672 (4th Cir. 2015) (internal quotation marks omitted). "Remittitur . . . 'is a process . . . by which the trial court orders a new trial unless the plaintiff accepts a reduction in an excessive jury award.'" *Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 305 (4th Cir. 1998) (quoting *Atlas Food*, 99 F.3d at 593). Indeed, if a court concludes

that a verdict is excessive, "it is the court's duty to require a remittitur or order a new trial." *Cline,* 144 F.3d at 305 (internal citations omitted).

### III. ANALYSIS

#### A. Liability Based on Causation

With respect to liability, ManTech contends that the Codys failed to present evidence at trial sufficient to establish the required casual connection between their filing of the *qui tam* action and their terminations.[1] In particular, ManTech argues that (1) there is no evidence of causation other than temporal proximity; (2) that the time between ManTech's learning of the Codys' *qui tam* action and their terminations was too long to support an inference of retaliation; (3) that "[w]here the time between the events is too great to establish causation based solely on temporal proximity, a plaintiff must present 'other relevant evidence . . . to establish causation,' such as 'continuing retaliatory conduct and animus' in the intervening period." *Perry v. Kappos*, 489 F. App'x 637, 643 (4th Cir. 2012) (quoting *Lettieri v. Equant Inc.*, 478 F.3d 640, 650 (4th Cir. 2007)) (omission in original); and (4) that there was no other relevant evidence to support causation.

In support of its contention that there did not exist any other relevant evidence to support the jury's finding of liability, ManTech argues that because ManTech's placing the Codys on administrative leave in January 2015 was not an adverse employment action, no inference of

---

[1] Through agreed upon jury instructions, the jury was instructed on causation under both the FCA and the Defense Contractor Whistleblower Protection Act based on the "contributing factor" standard coupled with the employer's defense of "demonstrat[ing] by clear and convincing evidence that it would have taken the same personnel action in the absence of" the protected activity. Nevertheless, ManTech contends in its Motion that the causation standard for FCA retaliation claims is a "but for" standard, not a "contributing factor" standard. While it appears to be an open question following the Supreme Court's decision in *Gross v. FBL Financial Services Inc.*, 557 U.S. 167 (2009), whether FCA retaliation claims have a "but for" or "contributing factor" causation standard, *compare United States ex rel. Marshall v. Woodward, Inc.*, 85 F. Supp. 3d 973, 985 (N.D. Ill.) (but for), *aff'd*, 812 F.3d 556 (7th Cir. 2015), *cert. denied*, 136 S. Ct. 2510 (2016), *with Pencheng Si v. Laogai Research Found.*, 71 F. Supp. 3d 73, 101 (D.D.C. 2014) (contributing factor), ManTech has waived any objection to the jury instructions on causation. This issue would not in any event change the Court's decision regarding the sufficiency of the evidence as to causation, as the evidence presented was sufficient as a matter of law for a reasonable jury to find by a preponderance of the evidence that the lawsuit was a "but for" cause of the Codys' termination as well as a "contributing factor."

retaliatory animus may be drawn from that action as a matter of law. Likewise, ManTech contends that no inference of retaliatory animus may be drawn from ManTech's actions and the history of animosity between the Codys and ManTech before ManTech learned of their protected activity, viz., the filing of this action. The Court concludes, however, that both categories of evidence were probative and admissible with respect to ManTech's retaliatory motivation. Having reviewed that evidence, as well as the evidence as a whole, the Court concludes that the evidence was sufficient as a matter of law for a reasonable jury to find the requisite causation.

With respect to evidence of ManTech's placing the Codys on administrative leave, the issue is not whether that administrative leave constitutes an adverse employment practice, but whether it can be probative of ManTech's retaliatory intent in this context. *See* Fed. R. Evid. 401. The evidence was undisputed that ManTech placed the Codys on paid administrative leave because of the lawsuit and soon after learning of it; and that administrative leave as a practical matter placed them in a different personnel category that had consequences within ManTech's organizational structure, including their ability to transfer to other positions. *See, e.g., Lettieri*, 478 F.3d at 651 (reasoning that plaintiff's supervisor's "strip[ping] [her] of significant job responsibilities" the month after her protected activity, including removing "her supervisory responsibilities over the sales team" and "her authority to set prices and meet directly with . . . clients," "made it easier for [the supervisor] to take the position later that [plaintiff] was not needed and should be terminated"). This was also not a case where the Codys had returned from administrative leave before their termination or had been given any prospects of returning. *Cf. Sturdivant*, 2009 WL 4030738, at *6 ("The Court finds that the Army's decision to put Plaintiff on paid administrative leave did not have any impact on the terms or conditions of Plaintiffs employment since he was allowed to return to work without demotion or reduction in pay.").

Neither of the Codys ever returned from administrative leave to work at ManTech; and the jury was entitled to consider whether ManTech's actions in the intervening period evidenced a retaliatory animus or whether, as ManTech explained, it acted out of business necessity.[2] Likewise, with respect to the evidence concerning ManTech's actions and the history of disputes and disagreements between the Codys and ManTech before ManTech learned of the Codys' *qui tam* suit against them. ManTech contends in that regard that the only possible inference from this evidence is that the Codys' fate was decided before ManTech learned of the suit. But that position ignores the overall context within which this lawsuit arose; and it was reasonable for the jury to infer that this lawsuit, as the culmination of the dispute between the Codys and ManTech, was the last straw for ManTech and that ManTech placed the Codys on administrative leave without any intention to ever allow them to return to work, an intention further reflected in ManTech's decision not to afford either an opportunity to be considered for other positions in ManTech despite testimony from its Chief Compliance Officer that in recent years ManTech has placed an emphasis on attempting to find other positions for employees who may otherwise be terminated. In sum, the evidence at trial was sufficient to sustain the jury's verdict that the Codys' lawsuit was a contributing factor in ManTech's decision to terminate them and that ManTech would not have terminated them absent the lawsuit. *See also Whalen*, 769 F.2d at 226 (4th Cir. 1985) ("A finding of motive should not be set aside by the reviewing court unless the evidence clearly compels rejection.").

For essentially the same reasons, the Court concludes after considering all the evidence, including the credibility of the witnesses, that the verdict with respect to liability in favor of each

---

[2] The rationale given by ManTech's President and Chief Operating Officer for placing the Codys on administrative leave was that Mrs. Cody could not represent ManTech to the very customer that she was accusing ManTech of defrauding and that Mr. Cody should not be in the corporate office with the same executives that must address the legal issues raised by his lawsuit.

8

Plaintiff is not against the clear weight of the evidence; and ManTech is therefore not entitled to a new trial.[3] While ManTech executives testified to a number cogent reasons for the Codys' terminations, including ManTech's President and Chief Operating Officer, who testified unequivocally that his decision to eliminate Mr. Cody's position was not influenced by the Codys' filing this *qui tam* suit, ManTech offered no corroboration for their testimony, such as internal documents reflecting that such a decision had, in fact, been made, before learning of the *qui tam* action; and a jury was entitled to assess the credibility of these interested witnesses and draw inferences other than those ManTech has argued.

**B.     Damages**

ManTech next contends that the evidence of Mr. Cody's and Mrs. Cody's emotional distress was insufficient as a matter of law to support any damages awards or, in the alternative, that the damages awards of $500,000 to Mr. Cody and $300,000 to Mrs. Cody for emotional distress were excessive and should be remitted. In particular, ManTech notes that the only evidence of distress came from testimony of the Codys and that neither of the Codys testified as to physical symptoms or medical treatment as a result of their terminations.

In reviewing an award for emotional distress, a court must first conclude that the evidence supports such an award and, if so, then "compare[] the jury's damages assessment to awards in comparable cases" to determine if it is excessive. *Jones*, 777 F.3d at 673 (citing *Hetzel v. Cty. of Prince William*, 89 F.3d 169, 172-73 (4th Cir. 1996)). "[A]n award of substantial compensatory damages. . . . must focus on the real injury sustained." *Hetzel*, 89 F.3d at 173 (omissions and internal quotation marks omitted). A "plaintiff must adduce sufficient evidence that such distress did in fact occur and that its cause was the [illegal action] itself and cannot be

---

[3] ManTech does not contend that the verdicts were based on false evidence or that finding ManTech liable would result in a miscarriage of justice.

attributable to other causes." *Knussman v. Maryland*, 272 F.3d 625, 639-40 (4th Cir. 2001) (internal quotation marks omitted); *see Hetzel*, 89 F.3d at 171–72 ("However, only a part of Hetzel's harms are properly attributed to appellants' retaliatory actions. *Much, if not all, of Hetzel's claimed distress was actually caused by her erroneous belief that she was the victim of invidious discrimination*, and of course, given the jury's findings for the defendants on all of Hetzel's claims of discrimination, Hetzel is entitled to no damages for any injuries which were caused by her belief that she was the victim of invidious discrimination.") (emphasis in original).

"[A] plaintiff's testimony, standing alone, can support an award of compensatory damages, [but] the evidence of the emotional distress must be demonstrable, genuine, and adequately explained." *Price*, 93 F.3d at 1251-52. "[N]either conclusory statements that the plaintiff suffered emotional distress nor the mere fact that a violation occurred supports an award of compensatory damages." *Doe v. Chao*, 306 F.3d 170, 180 (4th Cir. 2002), *aff'd*, 540 U.S. 614 (2004) (omission and internal quotation marks omitted); *see also Jones v. Southpeak Interactive Corp. of Del.*, 982 F. Supp. 2d 664, 680 (E.D. Va. 2013) ("To be sure, the Fourth Circuit also has held that plaintiffs who 'were discharged and had difficulty finding alternative employment' can receive greater compensation for their emotional distress, but a plaintiff cannot rely on a jury to infer or assume the emotional distress from that discharge.") (citation omitted), *aff'd*, 777 F.3d 658 (4th Cir. 2015). "Rather," the plaintiff's testimony "must indicate with specificity how the plaintiff's alleged distress manifested itself." *Bryant v. Aiken Reg'l Med. Ctrs.*, 333 F.3d 536, 547 (4th Cir. 2003) (internal quotation marks and alterations omitted).

To support their damages awards for emotional distress, the Codys point to evidence of their long careers at ManTech—approximately 25 years for Mr. Cody and 14 years for Mrs. Cody—along with testimony of Mrs. Cody indicating that she "loved working for ManTech,"

10

which was her "home" and "family," Tr. 768, and testimony of Mr. Cody that he would become upset when he drove past ManTech signs on his way to his new job. The Codys also point to Mrs. Cody's testimony that she and Mr. Cody "wanted to retire from ManTech. We wanted to work there until we could not possibly work there. I mean until we were old and gray probably. . . . We established a trust relationship with ManTech for years, and it doesn't go away in a day." Tr. 831. Mr. Cody also testified briefly before the jury about what he experienced during his three-month, post-termination job search, although he did so in general terms.

The Court must conclude that the evidence of emotional distress is inadequate as a matter of law to support an award of damages for emotional distress for either Mr. Cody or Mrs. Cody. As an initial matter, nearly all of Plaintiffs' testimony concerning emotional distress related to their pre-termination period when the MRAP contract was being bid and Mr. Cody was reassigned in 2012. For example, Mr. Cody testified that he was "demoralized" and felt like he had been "stabbed in the heart" when ManTech transferred him from his business unit to another corporate assignment in late 2012. Tr. 637. Plaintiffs properly do not rely on that testimony for purposes of the Motion, since any such feelings cannot be attributable their terminations. *See Knussman*, 272 F.3d at 639-40. But the Codys do rely on testimony that is also attributable, at least in part, to their treatment by ManTech prior to their termination, during the events leading up to their filing of the *qui tam* lawsuit against ManTech. For instance, the full context of Mr. Cody's testimony regarding seeing ManTech's signs is:

> [W]hen I drive [to the new job], it doesn't matter which way I drive, there are ManTech signs. And to me, somebody that gave so much to a corporation, I shouldn't be driving past a ManTech office. I should be at one of those ManTech offices. I should be in still the job I had running a successful business. I shouldn't have been pushed aside. I shouldn't have been pushed out, and I certainly shouldn't have been put on administrative leave. I wasn't talking to anybody at the time when they put me on administrative leave. And then further, they terminated me. So I mean, that's what should happen when somebody's ethical and honest and raises concerns and tells them what they're submitting

is not valid pricing, that price to win does not equal price to execute, and shows them and shows the compliance officer multiple times where the problems are, but they still come back with the corporate position that there was no wrongdoing?

Tr. 631-32. This full statement makes clear that Mr. Cody's lingering resentment towards ManTech was related in substantial part to his perceived unfair treatment as a result of the dispute over pricing that preceded his reassignment and which led to his filing the *qui tam* lawsuit against ManTech in 2013, not ManTech's termination of him for filing the lawsuit in 2015, after ManTech was served. Mr. Cody's testimony simply never isolated the emotional effect his termination had on him. Indeed, while he explained what he experienced and thought after the termination, he did not described in any detail the actual emotional impact the termination had on him.

Similarly, Mrs. Cody's testimony that she and Mr. Cody wanted to work at ManTech until they were old and gray was in response to a question about Mr. Cody's feelings upon getting transferred from his business unit to corporate in late 2012, not their feelings following their termination in 2015. And Mrs. Cody's testimony that ManTech was her "home" and "family" was in response to a question about how she felt about working for ManTech in the mid-2000s. Thus, like in *Hetzel*, "[m]uch, if not all, of" the Codys' "claimed distress was actually caused by" their "erroneous belief that" they had been wronged by ManTech prior to their termination.

Even as it related to their wrongful terminations, Plaintiffs' passing comments fall well short of the Fourth Circuit's requirement that a plaintiff "must indicate with specificity how the plaintiff's alleged distress manifested itself." *Bryant*, 333 F.3d at 547. Neither Mr. Cody nor Mrs. Cody discussed any emotional or mental *effect* they suffered from being terminated by their longtime employer in unfair circumstances. Indeed, they failed to make even "conclusory

statements" that they suffered emotional distress. Their brief bits of testimony from five days of a jury trial, from which one could infer that they were understandably upset over their terminations, are insufficient as a matter of law to support the conclusion that an actual emotional distress injury had been sustained by either of the Plaintiffs as a result of their terminations.

The Court recognizes that the emotional distress accompanying lost income from an unlawful termination can support a damages award. *See, e.g.*, *Hetzel*, 89 F.3d at 172. But a plaintiff must still articulate how that lost income or job search caused emotional distress. *See Jones*, 982 F. Supp. 2d at 679. Otherwise, the award would rest on the mere fact that an unlawful termination occurred, which the Fourth Circuit has cautioned against. *See, e.g.*, *Doe v. Chao*, 306 F.3d at 180. Mr. Cody's brief and general description about his job search, like his other testimony, did not explain any way in which he was affected emotionally or mentally by his job search. And the bulk of the Codys' testimony regarding their job search efforts occurred in the proceedings regarding front pay, before only the Court following the jury's verdict.

The Codys' evidence of emotional distress as a result of their termination is also far less than what courts have found inadequate as a matter of law to support any award for emotional distress. For example, in *Price*, where the Fourth Circuit held that the evidence was insufficient to support an award of compensatory damages based on emotional distress, one plaintiff-police officer "testified that he felt 'betrayed,' 'embarrassed,' and 'degraded and passed over'" by the defendant-city's raced-based promotion policy. 93 F.3d at 1255 (alterations and omission omitted). Another "testified that he felt 'devastated' by the City's 'perpetrating its deceit,' explaining that he felt 'used as a pawn,' and 'betrayed, lied to, used,'" and that his self-esteem

dropped as a result. *Id.* The Fourth Circuit concluded that "their injuries, if any, are properly characterized as disappointment with their superiors, rather than emotional distress." *Id.* at 1256. In *Doe v. Chao*, where the plaintiff's social security number had been disclosed in violation of the Privacy Act, the Fourth Circuit held that the evidence could not sustain an award of compensatory damages for emotional distress where the plaintiff "testified he was 'greatly concerned and worried' about the disclosure of his SSN"; "that he felt his privacy had been violated in 'words he cannot describe'"; "that he felt the consequences of the disclosure of his SSN could be 'devastating' for himself and his wife, and that the disclosure of his SSN had 'torn him all to pieces,' in a manner that 'no amount of money' could ever compensate." 306 F.3d at 181 (alteration omitted).

Likewise, other circuits have imposed similar demanding requirements for an award of emotional distress damages. For example, the Seventh Circuit concluded that evidence was insufficient to support an award of compensatory damages for emotional distress where the wrongfully terminated plaintiff "testified that he was affected emotionally by being fired, and that he was concerned over 'the idea of my family going through it,'" holding that a plaintiff must "show '*demonstrable* emotional distress,' not just point to circumstances of the constitutional violation which might support an inference of such injury." *Biggs v. Vill. of Dupo*, 892 F.2d 1298, 1304 (7th Cir. 1990) (emphasis in original) (citation omitted); *see also Jones*, 982 F. Supp. 2d at 679 (noting that *Biggs* was cited approvingly by the Fourth Circuit in *Price*, 93 F.3d at 1252).

The insufficiency of the Codys' evidence is also illustrated by those cases where awards have been reduced in the face of substantial evidence of emotional distress damages. For example, the Fourth Circuit remitted a $245,000 jury award for emotional distress to $150,000

14

where the plaintiff "offered considerable objective verification of her emotional distress, chronic anxiety, and frustration during the twenty-one months that she attempted to correct [the defendant-credit reporting agency's] errors." *Sloane v. Equifax Info. Servs., LLC*, 510 F.3d 495, 503 (4th Cir. 2007). This "objective verification" included "sufficiently articulated descriptions of her protracted anxiety through detailed testimony of specific events and the humiliation and anger she experienced as a result of each occurrence"; corroboration of her distress from others, including her husband who "described in detail his wife's ongoing struggles with Equifax and the emotional toll these events took upon her"; the "physical symptoms" in which the "emotional distress manifested itself," "particularly insomnia"; and evidence that the stress affected her marriage. *Id.* at 503-04 (internal quotation marks omitted). Even in *Cline*, where Fourth Circuit remitted to $10,000 a jury's award of $117,500 in compensatory damages for demotion in violation of the American with Disabilities Act, the plaintiff testified that his demotion "was actually a worse feeling than when the doctor told him that he had a recurring brain tumor," and a coworker and his wife corroborated his distress, with his wife testifying that he was "was 'very upset and down in the dumps' over his demotion" and "'had been having some outbursts of temper at home.'" 144 F.3d at 304-06 (alteration omitted).

In short, Plaintiffs failed to present evidence of "demonstrable, genuine, and adequately explained" emotional distress. There is simply no evidence of any manifestation of emotional distress; and the jury's verdict is based on nothing more than an inference that emotional distress accompanied Plaintiffs' termination. For these reasons, the Court finds that the evidence is insufficient as a matter of law to support an award of damages for emotional distress to either Mr. Cody or Mrs. Cody. Accordingly, the Court does not reach the issue whether the awards are excessive and should be remitted.

15

## IV. CONCLUSION

For the above reasons, the Court concludes that the evidence is sufficient as a matter of law to sustain the jury's finding of liability for retaliation but not an award of damages for emotional distress. Accordingly, it is hereby

ORDERED that ManTech's Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial [Doc. No. 127] is GRANTED in part and DENIED in part; it is GRANTED insofar as the Court finds the evidence at trial insufficient to support compensatory damage awards for emotional distress to either Plaintiff and is otherwise DENIED; and it is further

ORDERED that the jury's verdict awarding Plaintiff Muge Cody compensatory damages for emotional distress in the amount of $300,000 be, and the same hereby is, VACATED; and it is further

ORDERED that the jury's verdict awarding Plaintiff Kevin Cody compensatory damages for emotional distress in the amount of $500,000 be, and the same hereby is, VACATED.[4]

The Clerk is directed to forward a copy of this Memorandum Opinion and Order to all counsel of record.

/s/
Anthony J. Trenga
United States District Judge

Alexandria, Virginia
May 19, 2017

---

[4] By separate Order, the Court has ordered the entry of an amended final judgment pursuant to Fed. R. Civ. P. 58 in light of this Memorandum Opinion and Order and the Memorandum of Decision and Order with respect to its ruling on Plaintiffs' entitlement to front pay damages.

16